780 A.2d 440

ALLFIRST BANK,

v.

DEPARTMENT OF HEALTH AND MENTAL HYGIENE, et al.

No. 1483, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Sept. 7, 2001.

**338**

Michael G. Gallerizzo (Gebhardt & Smith, LLP, on the brief), Baltimore, for appellant.

Catherine Talbott, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for DHMH.

Nancy E. Gregor, Towson, for Caroline Center, Inc.

Argued before HOLLANDER, SONNER, THEODORE G. BLOOM (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

The dispute in this appeal concerns the amount of attorneys' fees awarded by the Circuit Court for Prince George's County to Allfirst Bank ("Allfirst" or the "Bank"),[1] appellant, in connection with the default by the Caroline Center, Inc., appellee, of a secured loan made on May 6, 1997, in the amount of $350,000. At the relevant time, the Caroline Center, Inc. (the "Center," the "Borrower," or the "Caroline Center"), a private adult care facility, was in receivership, pursuant to proceedings initiated by the Department of Health and Mental Hygiene ("the Department"), appellee.

The Bank incurred attorneys' fees of almost $55,000 during a 15–month period when, as a secured creditor, it attempted to recover the monies owed by the Center. Although the terms of the loan obligated the Borrower to pay the Bank's attorneys' fees, the court only awarded Allfirst legal fees of $25,702.85, pursuant to an Order of July 26, 2000. This appeal followed.

---

1. In this opinion, our references to the Bank shall include the Bank's predecessors, FMB Bank and the First National Bank of Maryland, unless otherwise noted.

Allfirst presents four questions, which we have consolidated, rephrased, and re-ordered:

I. Did the circuit court err or abuse its discretion in awarding partial attorneys' fees to appellant, based on its finding that the attorneys' fees incurred by Allfirst after the initial hearing were unnecessary?

II. Did the circuit court deny appellant due process by holding a prompt hearing on the issue of attorney's fees, without prior notice, and without affording the Bank an opportunity to respond in writing or to present evidence in support of its claim for attorney's fees?

The Department has moved to dismiss the appeal, claiming that appellant has not appealed from a final judgment. For the reasons that follow, we shall deny the motion to dismiss, vacate the award of attorneys' fees, and remand for further proceedings.

## FACTUAL BACKGROUND

The Caroline Center, a Maryland corporation, is a private adult care facility that was licensed in 1984 to house and care for developmentally disabled adults. *See* Md.Code (1982, 2000 Repl.Vol.), § 19–333(c)(2) of the Health–General Article ("H.G."). It is funded by the Department's Developmental Disabilities Administration. In 1999, the Center provided residential services to approximately 48 clients and day services to about 76 non-residential clients.

Addie Houston, the Center's Executive Director, resigned in 1994. Shortly thereafter, the Center hired Life Action Partnership, Inc. ("LAP"), a for-profit Maryland corporation, to manage the Center. Houston was President and sole stockholder of LAP.

On May 6, 1997, the Center obtained a line of credit from the First National Bank of Maryland, evidenced by a $350,000 Demand Business Purpose Promissory Note ("the Note") dated May 6, 1997, executed by the Center and payable to the Bank, along with a loan agreement of the same date. The loan was collateralized by a perfected first priority security

interest and lien in almost all of the Center's non-real estate assets, under a Security Agreement dated May 6, 1997. Financing statements were also executed by the Center in favor of the Bank.

Paragraph 10 of the Note is relevant here. It provides:

10. **EXPENSES OF COLLECTION.** Borrower shall pay all costs and expenses incurred by Bank in collecting sums due under this Promissory Note, including without limitation the costs of any lien, judgment or other record searches, appraisals, travel expenses and the like. *In addition, if this Promissory Note is referred to an attorney for collection, whether or not judgment has been confessed or suit has been filed, Borrower shall pay all of the holder's costs, fees (including but not limited to, the holder's attorney's fees, charges and expenses) and all other expenses resulting from such referral.*

(Emphasis added).

Several sections of the Security Agreement are also pertinent:

I. **DEFINITIONS**

\* \* \*

F. **Obligations.** The term "Obligations" means collectively the obligations of [Caroline Center] to pay to Bank: ... (iii) the expenses of retaking, holding, preparing for sale, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by Bank of Bank's rights *in the event of a default by Borrower or any Other Obligor, together with Bank's attorneys' fees, expenses of collection, and court costs.*

\* \* \*

II. **GRANT OF SECURITY INTEREST**

A. **Collateral.** As security for all Obligations of Borrower to Bank, and in consideration of advances from Bank to Borrower, [Caroline Center] hereby grants and pledges to [Allfirst] a continuing security interest in all of [Caroline

Center's] Equipment, Inventory and Receivables, together with all the Other Property of the [Caroline Center].

\* \* \*

## VI. REMEDIES

A. **Specific Rights and Remedies.** In addition to all other rights and remedies provided by law and the loan documents, [Allfirst], upon the occurrence of any default, may: (i) accelerate and call due the unpaid principal balance of any promissory note evidencing any of the Obligations, and all accrued interest and other sums due as of the date of default. . . .

B. **Costs of Collections.** Upon the occurrence of any default, [Allfirst] shall be entitled to recover from [Caroline Center] *attorneys' fees equal to fifteen percent (15%) of the unpaid balance of the Obligations at the time of default (to the extent not prohibited by law), plus court costs and other expenses which may be incurred by Bank in the enforcement or attempted enforcement of its rights hereunder,* whether against any third party, [Caroline Center], or any Other Obligor. Expenses recoverable from [Caroline Center] shall (to the extent not prohibited by law) include costs of collection including salaries, out-of-pocket travel, living expenses and the hiring of agents, consultants, accountants, or otherwise. *All sums of money thus expended, and all other monies expended by Bank to protect its interest in the Collateral (including insurance, taxes or repairs) shall be repayable by [Caroline Center] to [Allfirst] on demand,* such repayment to be secured as provided above in paragraph II.

(Emphasis added).

The Center acknowledges that it experienced a "period of mismanagement and financial instability." On or about May 6, 1999, LAP notified the Department that it would be unable to meet the Center's payroll for May 21, 1999, because Allfirst refused to release funds to the Center for that purpose. As a result, the Department provided the Center with funds to continue its operations.

After reviewing documentation submitted by the Center, the Department notified the Center and LAP on May 14, 1999, that it had reason to revoke the Center's license due to the Center's financial problems. Nevertheless, the Department sought to assist the Center with its management and financial problems, so that it could continue to provide services to its clients. To that end, appellees attempted to negotiate a forbearance agreement with the Bank, without success. Instead, on May 27, 1999, the Bank demanded immediate payment of the $350,000 due and owing under the Note, which was then in default.

By letter of May 28, 1999, the Bank contacted the Center regarding the default, stating that the Center "has been in default thereunder for a significant period of time. For these reasons, [Allfirst] is immediately entitled to exercise and enforce various rights, remedies and recourse under Loan Documents and applicable law ..." Indeed, Allfirst immediately seized approximately $43,000 from the Center's checking account.

On the same date, May 28, 1999, the Department and the Center entered into a Consent Agreement, which incorporated a plan to restore financial stability to the Center. For fiscal year 2000, the Caroline Center expected to receive its first quarterly payment from the Department on July 1, 1999. Until then, pursuant to the Consent Agreement, the Department agreed to provide the Center with approximately $575,000 in operating funds, to enable it to provide services through June 30, 1999. The Department provided the Center with financing of $558,700 on June 3, 1999.

Pursuant to H.G. § 19–334, the Department filed a "Petition for Appointment of Receiver" (the "Petition") on June 2, 1999, to allow the Center to continue to operate and furnish care to its disabled residential and non-residential clients in Prince George's and Montgomery counties and on the Eastern Shore, who ranged in age from 17 to 77. In the Petition, the Department averred that the Center was insolvent, in imminent danger of closing, and that a receiver was needed for the

welfare of the Center's clients. Further, the Department alleged that it wanted to "protect the consumers and assume the rights of all creditors," which required "time," due to the Center's many problems. In its brief, the Department explains that it filed the Petition "to protect the remaining assets of the Caroline Center, preserve monies paid by the Department to support continuing operations, and to ... resolve other issues of management and finances." On the same day, the court appointed Maryland First Financial Services Corporation, Inc. as the receiver (the "Receiver").

On June 11, 1999, the Receiver moved to stay all actions against the Center, claiming that "a stay is necessary to permit the Receiver to identify and assess the financial obligations of the Center, develop a plan for orderly administration of the Center's facilities, and ensure the health, safety and well-being of the clients of the Center without the distraction and expense of dealing with claims by creditors on an ad hoc basis." The Receiver sought to avoid payment to the Bank of the monies that had been advanced to the Center by the State.

On June 17, 1999, Allfirst filed a discovery motion and a "Motion For Order Directing Receiver to pay Indebtedness Pursuant to Maryland Code Health–General § 19–337(f)(1)." The Bank claimed that the statute entitled it to immediate payment, in full, of its secured debt. The court held a hearing on the motion on June 28, 1999. Although we have not been provided with a transcript of that hearing, the parties seem to agree that the court assured appellant's counsel that the Bank would eventually obtain payment of its debt, with interest.

By order of July 9, 1999, the court denied Allfirst's motions, stating that "immediate repayment of the entire indebtedness of Caroline Center ... would place the Receivership in a precarious financial position and would place at risk the operations of the programs and the welfare of Caroline Center's clients." Nevertheless, the Court ruled that "the Receiver may pay to [Allfirst] on a monthly basis principal in the amount of $10,000, plus interest at the prime rate plus zero," and authorized the Receiver to apply to the court to alter the

amount of monthly repayment to the Bank. Additionally, the court "prohibited" the "commencement or prosecution of any actions" against Caroline Center or its assets.

On September 22, 1999, the Receiver filed two petitions for approval of administrative fees and expenses. The first petition covered June 1999 and sought fees and expenses for the Receiver totaling $54,279.91, as well as payment to its legal counsel in the amount of $16,621.21. The second petition, for the period of July and August 1999, sought fees and expenses for the Receiver in the amount of $82,215.65, and attorneys' fees for its legal counsel in the amount of $7,191.05. Pursuant to a status hearing on September 22, 1999, the court approved the Receiver's first fee petition.

On October 4, 1999, Allfirst filed a 25–page objection to the Receiver's second petition for fees and expenses, plus exhibits to support the objection, although it did not quarrel with the payment of legal fees for the Receiver's attorneys. Allfirst complained about "inefficiencies" and "duplication" and asserted that it would be "impossible to determine whether such fees are reasonable in many respects due to the format of the Receiver's bills and because the fees and expenses attributable to intra-office conferences and to the Receiver's travel are demonstrably excessive." Moreover, Allfirst alleged that, since its inception, the receivership sustained losses of almost $48,000, despite collection by the Receiver of significant fees and payment to the Bank of only $30,000 on the Center's debt. In its brief, Allfirst asserts that, in the first six months of the receivership, the Receiver lost approximately $61,000, almost twice the amount of loss sustained by the Center in the twelve month period prior to the receivership.

On November 10, 1999, the Receiver refiled its second petition for fees and expenses. A hearing was held on January 3, 2000, at which the court approved the Receiver's petition, and ordered payment to the Receiver of $82,215.65 for its fees and expenses, and payment of $7,191.95 for its counsel fees. It cautioned the Receiver about the costs, however.

On March 7, 2000, the Receiver filed a "Motion for Approval of Sale of Property," with respect to the Center's woodworking facility in Denton. The Contract of Sale, dated January 14, 2000, provided for a sale price of $145,000. On March 16, 2000, Allfirst responded to the motion by asking the court to order payment to the Bank of the net proceeds of sale, $69,947.77, asserting that it had a first-priority duly perfected security interest and lien in the Center's non-real estate assets under H.G. § 19–337(f)(1), and was entitled to payment. After a hearing, the court issued an order dated March 20, 2000, approving the sale but denying Allfirst's request for recovery of the net proceeds of sale.

On June 1, 2000, the Department and the Receiver filed a joint petition seeking a one year extension of the receivership and a delay of the obligation to repay the Bank ("Extension Petition"). They asserted that the Center's "financial condition continues to be one in which revenues over the course of the fiscal year are barely equal to expenditures," and explained that the Receiver was "in the process of having the properties of Caroline Center appraised and making other preparations to apply for a loan that would retire the Allfirst debt . . ."

On June 8, 2000, Allfirst filed an objection to the Extension Petition, along with a request for a hearing. It opposed the requested extension on the ground that it would further deplete the assets of the Center. Relying on H.G. § 19–337(f)(1), the Bank also maintained that such a lengthy extension would be unfair. Instead, it requested a four-month extension of the receivership, arguing that in that time Allfirst's loan could be refinanced. A hearing was scheduled for Tuesday, July 25, 2000.

On Monday, July 24, 2000, one day before the hearing scheduled with regard to the Extension Petition, the Receiver filed "Receiver's Request For Approval To Pay Off Allfirst Loan and for Release of Allfirst Liens" (the "Payment Petition"). The Certificate of Service is dated July 21, 2000 and the Payment Petition apparently was received by the Bank on

that date. The Payment Petition included a request that the Center and Allfirst pay their own attorneys' fees. As to the attorneys' fees, the Receiver stated:

Allfirst also claims that Caroline Center is responsible for Allfirst's attorneys ['] fees and expenses in the amount of $46,951.43. The majority of Allfirst's fees and expenses were incurred after this Court entered its Order directing how the Receiver should make payments on Allfirst's debt. Allfirst's repeated and costly efforts to better its position were both distracting and wasteful. They had the effect of causing Caroline Center to incur great expense to defend against Allfirst's unreasonable demands and preserve the payment schedule adopted by this Court and the only payment schedule that would allow it to meet its payroll obligations through the end of its fiscal year. Under these circumstances, it would be equitable for the Receiver to request that Allfirst reimburse it for the cost of defending against these wasteful proceedings. Rather than incur the costs associated with such an undertaking, the Receiver instead requests that this Court order Allfirst to bear its own costs and fees.

Counsel for the Center, the Department, and the Bank were present at the hearing on July 25, 2000, scheduled solely with regard to the Extension Petition. During the course of the hearing, the Center's attorney referred to the Receiver's Payment Petition, in which the Receiver sought permission to satisfy the Center's debt to the Bank. The following colloquy is relevant:

[THE CENTER'S ATTORNEY]: We have filed, as Your Honor probably knows, three additional items yesterday that will speed this along in wrapping this up.

THE COURT: And pay him off?

[THE CENTER'S ATTORNEY]: Pay him off.

THE COURT: How soon would that be?

[THE CENTER'S ATTORNEY]: We can give him a check for principal and interest today.

THE COURT: That's all he wants. He'll shut up and go home.

[THE CENTER'S ATTORNEY]: That would be our fervent hope, Your Honor.

The Bank's attorney immediately asserted, however, that the Bank also sought to recover its attorneys' fees of approximately $55,000. The Bank's attorney stated, in relevant part:

Your Honor, there are fees that are owed to the [B]ank. My attorney's fees, which we're entitled to collect under the documents, which they're refusing to pay for. That is, that the subject of one of the motions that was filed on Friday, which we have not responded to yet. We just got the motion. That's an issue that is going to need to be determined by the Court.

Allfirst continued:

We have loan documentation, Your Honor, that specifically says we're entitled to collect our costs, expenses and fees resulting from the referral of this matter to my law firm. That's a binding document that Caroline is obligated to abide by. The receiver has offered to pay us principal and interest, but is not willing to pay our attorney's fees.

The Center's attorney responded that the loan document "assumes an element of reasonableness in terms of the fees," and complained that the Bank's work was "not productive." An extensive discussion ensued concerning the proceedings that had transpired in the prior year. The Center's lawyer argued, in part:

Allfirst, in effect, brought about this receivership way back a year ago. In the interim this Court, when the receiver was appointed to protect the Caroline Center from the further collection actions of the [B]ank, this Court then ordered that the [R]eceiver could pay to the [B]ank $10,000 a month plus interest. The [R]eceiver has done that and, in fact, has brought that loan down to approximately half of its original size.

All of these trips to this court, Your Honor, have not changed that, have not been productive, have cost the

receivership money, and so in that sense they are unreasonable. I'm not talking about anything [appellant's counsel] did or was it too much time or anything like that. That's between him and his client.

What I'm saying is that it was unnecessary, it was unproductive and, in fact, it was counter productive in terms of the cost and amounts of time spent in responding to this, and that's the basis for arguing that [appellant's counsel] and his firm are not entitled to be paid by the Caroline Center.

Allfirst countered with its reasons for participating in the proceedings in the way that it had over the course of the year. The Bank's counsel stated, in relevant part:

[I]nitially we met with the [R]eceiver, we met with the State in an attempt to work this out before the receivership was filed. . . . Receivership was then filed. There was no provision for any payments to us early on in the case. There were no discussions about paying us anything until the initial hearing.

Ultimately we had filed pleadings in order to obtain some sort of payment, and ultimately at that first hearing they agreed to pay us $10,000 plus interest. That took the efforts of my firm to get involved in order to precipitate some payments.

There were some fee applications that were filed, Your Honor, that we had some problems. Once again they were using our collateral to pay fees, to pay the expenses of the receivership. We had problems with those. I think Your Honor cautioned them to keep track of what they were doing and to hold expenses down to the extent they could.

Today we're here, Your Honor, on this particular proceeding today because they moved to extend this receivership for a year. When they filed the paperwork there was no loan in place. They have obtained the loan in between. That's why we're here today, because we viewed this as we could be here for another year, Your Honor. That's why we're here today.

In summarizing the Bank's position, Allfirst's attorney said: "[E]verything that we've done in this case, we've done it to protect our interests . . ." Allfirst also asked the court for "the opportunity to brief this issue," explaining that the "pleadings [i.e., the Payment Petition] were just filed."

The court reminded Allfirst that, at the inception of the receivership, it had assured the Bank that it would eventually obtain payment. Therefore, the court ruled that it would only require the Receiver to pay attorneys' fees to the Bank up to and including the first hearing, when the judge assured the Bank that it would, in time, recover the monies owed by the Center. The court said:

> I'll tell you what I'm going to do. Pay for the first hearing that I presided over in courtroom 203, when I made it very, very clear what the process was going to be, and I made it very clear to the [B]ank you're going to get your money. The only question is when. That was the first hearing we had in courtroom 203.

The following colloquy is also noteworthy:

> [BANK'S COUNSEL]: So you're saying the fees up to that hearing is what you are saying?
>
> [THE COURT]: Absolutely. I'm going to pay off including that hearing, to include that hearing.

Further, the court said:

> Let me suggest something here. I think that a case could be made that the [C]enter was poorly managed to a point that someone whose funds were being used in running that had a right to get involved to preserve its assets. The mere fact that the receivership came into being suggests that things had gone awry. So if I were in a financial institution and I had advanced funds to this entity I would be involved at that point to make sure that no further legal waste occurred and that therefore I'm going to get my money back without too much ado.
>
> I don't have a problem with that. That's good business. And banks have to do that in order to maintain their solvency. I don't have a problem with that. *I am talking*

*about the attorney's fees that were generated after that hearing, when I assured the [B]ank it will get its money. The interest is going to run. It's just a matter of settling down the [C]enter so that it is financially sound and then the [B]ank would get its money.*

*I'm talking about the attorney's fees subsequent to that. I think the [B]ank is justified in acting affirmatively up to that point. After that the Court has guaranteed that [B]ank its money.*

\* \* \*

*I think you've over done it.* I have no problems in my thinking that you have over done it. I told you months ago you're going to get your money. The interest was running. They're not holding your money free and clear. You're being paid for the time that they are holding your money. They're paying you interest. That's what you're in business for.

\* \* \*

You're going to get your money, and I told you that ab initio, and *you knew you were going to get your money.*

\* \* \*

You're dealing with the government here. Nobody is going to deprive a bank of its money, and the [B]ank knows that.... Every time we've had a hearing I've heard the same arguments that have accomplished nothing, nothing. When the Court rewards such things by paying counsel fees for all of that, that accomplishes absolutely nothing. All it does is encourage that type of thing in the future.

(Emphasis added).

The court and the Bank's attorney continued to spar with respect to the Bank's entitlement to legal fees.

[BANK'S COUNSEL]: I'm asking [that] our fees be paid in accordance with the documents. We believe we protected our rights. We had to do this. The [B]ank does this when we have to work out situation like this. *We monitor the cases, we protect our rights and do what we think—*

[THE COURT]: *And run up your fees.*

[BANK'S COUNSEL]: *We don't run up our fees. I disagree with that comment, Your Honor.*

[THE COURT]: *It seems that way to this Court.* Every time I had a hearing you were here.

[BANK'S COUNSEL]: If I may request of the Court, what should we have done?

[THE COURT]: *I told you the very first time you're going to get your money. Did I not?*

[BANK'S COUNSEL]: *You did say that, Your Honor.* Yes, you did, absolutely.

[THE COURT]: Has anyone ever suggested that the interest that's running wasn't going to be paid?

[BANK'S COUNSEL]: No, Your Honor, absolutely not.

[THE COURT]: All right. So what was being accomplished? That was the question I asked you a moment ago.

[BANK'S COUNSEL]: *I think what I told you was we wanted to get our l[oan] paid off as quickly as possible, and we believe our efforts led to that.* We believe that's brought the [R]eceiver to a point where it refinanced the loan.

[THE COURT]: I think they're refinancing this loan for another reason but I can't speak for them.

(Emphasis added).

The Bank's attorney again asked for an opportunity to brief the matter, noting that the Receiver's Payoff Petition had just been filed. The following ensued:

[BANK'S COUNSEL]: I obviously oppose the entry of the order regarding payments of only principal and interest in the [B]ank and not attorney's fees. I again request that the Court give us an opportunity to brief that issue. I'd ask we do it, that the Court allows us to do it promptly, and to the extent a hearing is necessary, the Court schedule one or rule on the papers. But I'd like to have the opportunity to brief on that issue. That's a significant issue for my client. We'd like the opportunity to do that.

[THE COURT]: What is the total of the attorney's fees we're talking about?

[BANK'S COUNSEL]: We're talking about, Your Honor, as of last Friday $54,161.49.

[THE COURT]: $54,161.49?

[BANK'S COUNSEL]: Yes, Your Honor.

[THE COURT]: That's a lot of money. What else?

[BANK'S COUNSEL]: In short, if there's going to be a delay in payment of Allfirst Bank's loan, we'd ask that the receivership be, the extension be limited to four months.

[THE COURT]: If there's going to be a delay in payment of our claim?

[BANK'S COUNSEL]: A delay in payment of our claim.

[THE COURT]: There was no claim, was there?

[BANK'S COUNSEL]: I believe that—there's been no decision as to how—when we're going to be paid if there's no determination on the attorney's fees today. There's been no determination.

[THE COURT]: They can go ahead and pay everything they're scheduled to pay even if I don't grant the attorney's fees. They can pay the rest of it off. That's not a problem. Then the only thing to be litigated in Annapolis would be whatever attorney fees that I think are inappropriate. You can do that, couldn't you?

[BANK'S COUNSEL]: Yes, Your Honor, yes. But I'd ask the opportunity to be able to brief the issue of the attorney's fees.

[THE COURT]: All I'm trying to do is to keep from adding—

[BANK'S COUNSEL]: I agree with that totally.

[THE COURT]: I don't want to use the term insult to injury, but that's the first thing that comes to mind. You're going to do this pro bono?

[BANK'S COUNSEL]: I will do the brief pro bono, yes, to show this Court that we're not trying to run up the fees. I

take issue with that comment and, you know, basically we are trying to protect the client's interests here.

[THE COURT]: I don't think that anyone said you're trying to run up fees. I don't think anyone has said that. I didn't say that. I don't recall the receiver saying that. So who said that?

[BANK'S COUNSEL]: Well—

[THE COURT]: *I said in the past I think that you have cost us fees unnecessarily by coming to hearings that accomplished absolutely nothing for the [B]ank and did not help protect the [B]ank's money because the [B]ank's money was already protected.* It was not an—

[BANK'S COUNSEL]: Would Your Honor agree at least the first hearing we needed to be there? There was no provision on the table for paying the [B]ank. There was no provision whatsoever to deal with the [B]ank at that point.

[THE COURT]: All right. First hearing justified. Now what?

[BANK'S COUNSEL]: The next hearing were the attorney's fees and—excuse me, the [R]eceiver's fees. There was an 80 some thousand dollar bill that was before the Court and we came to the Court and tried to limit the expense associated with this receivership because once again our assets, the loans—we have loans that were being utilized to pay these things.

[THE COURT]: Sir, hold on now. This [C]enter was being backed up by the State, was it not?

[BANK'S COUNSEL]: Yes.

[THE COURT]: There was a loan from the [B]ank to the [C]enter, is that correct?

[BANK'S COUNSEL]: That's correct.

[THE COURT]: These people are standing in the shoes of the State. The State is guaranteeing the existence—

[BANK'S COUNSEL]: Your Honor, you have to understand at the beginning of the case, at the beginning of this case we negotiated with the State, negotiated with the

parties that be [sic] of the [C]enter and they turned on us at the outset.

[THE COURT]: What do you mean by the expression they turned on you? Did they say we're not going to pay you your money?

[BANK'S COUNSEL]: No, Your Honor, they didn't say that.

[THE COURT]: *All right. Since the State is backing all of this up the [B]ank knew that it was going to get its money. The only issue was when.* And in the interim, for the use of that money they're being paid interest.

[BANK'S COUNSEL]: What about the [B]ank's—

[THE COURT]: And am I saying anything inaccurate?

[BANK'S COUNSEL]: *You're saying nothing inaccurate. You're absolutely 100 percent correct, but—*

[THE COURT]: What was accomplished by all of the fees generated by the [B]ank's appearance at the hearings? That's what I'm asking.

[BANK'S COUNSEL]: I'm starting with the first hearing. With the first hearing we had no idea what was going to happen.

[The COURT]: I gave you the first hearing.

\* \* \*

[BANK'S COUNSEL]: *... So I came to the first hearing before Your Honor, where we asked for payments, if Your Honor remembers, and that did result in a payment being made to us.*

*The second hearing was on the fee application.* I think it was in October when we came. I'm trying to remember— there was a *third hearing that dealt with the real estate. We asked that the excess proceeds of the real estate not be used for the [C]enter, but be used to pay us down, and they've been escrowed until now. And this is the fourth hearing we've come to,* Your Honor. Now, the [R]eceiver—

[THE COURT]: *I don't think anybody at all questions the first hearing.* If I were the [B]ank I'd want to be there to

see what's going on, how is this thing set up, does it look like I'm going to get my money, am I being guaranteed my money. And I think *this Court made it clear at that first hearing the [B]ank's going to get its money.* But the priority is going to go with preserving the Caroline Center. Now, if I'm incorrect in any of this—

[BANK'S COUNSEL]: *No, Your Honor's correct in everything* you said. Your Honor, I'm not disagreeing with you on that.

[THE COURT]: So I think what I am talking about is what followed that. That's what I think I'm talking about, what followed that.

[BANK'S COUNSEL]: And I reiterate for the Court that *the hearings we're talking about are, one, a hearing on a very significant fee application, which Your Honor cautioned the [R]eceiver to watch his expenses. The second was on the sale of real estate,* where we went to the [R]eceiver and said pay the excess proceeds to us and he said no. He said he wanted to hold on to it to operate the business with, but he had to use it, and there was a fight over whether the State had a lien [o]n those proceeds.

*And then the final hearing is today,* Your Honor, where at the outset they were looking to extend the receivership for a year, and our concern, Your Honor, and I think it was *a justifiable concern, was that this receivership would be extended for a year, the financing*—which the process of trying to get the financing started back in November, that that process would continue for another year. We would continue to be paid at $10,000 plus interest. That was a concern we had.

(Emphasis added).

Accordingly, the court approved the Receiver's Payment Petition as to Allfirst's loan, and ordered Allfirst to release all liens against the Caroline Center upon payment. But, the court denied, in part, appellant's request for legal fees. Rather than awarding the Bank the requested amount of $54,161.49 in counsel fees, the court ordered payment to appellant of

$25,702.85 in attorneys' fees, and disallowed the remaining $28,458.64 of its request. In its Order of July 26, 2000, the court said, in relevant part:

> B. That, in addition, Caroline Center, Inc. shall pay to Allfirst attorneys['] fees and costs in the amount of $25,702.85, for services and expenses in connection with the collection efforts of Allfirst Bank through the hearing held before this Court on June 28, 1999 and that *all other attorneys fees and costs are disallowed;* and
>
> C. That Allfirst Bank *shall release all liens* and security interests with respect to the indebtedness upon receipt of Caroline Center, Inc.'s *payment in full of principal and interest due and attorneys['] fees* and costs as set forth herein.

(Emphasis added). In a separate order of the same date, the court awarded attorneys' fees to counsel for the Receiver, totaling almost $49,000, for invoices dated between October 1999 and April 2000.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Preliminarily, we address the Department's Motion to Dismiss the appeal. The Department has moved to dismiss, claiming that the Bank has not appealed from a final judgment, because the receivership has not been concluded, nor has the circuit court certified the matter for appeal. The Department also claims that appellant may still file a proof of claim under Md. Rule 13–401(c), and is therefore not aggrieved by the trial court's decision.[2] According to the Department,

---

2. Maryland Rule 13–401 states, in relevant part:

 **Rule 13–401. Proof of claim.**
 (a) **Filing.** Any person who wishes to make a claim against the estate of a debtor *shall* file a verified proof of claim with the clerk.

[t]he circuit court's order had the effect of setting the amount of attorney's fees to be paid to Allfirst's counsel pursuant to the payment to Allfirst of principal and interest. Although not stated by the court, it was implicit under the Md. Rules that Allfirst could still file a proof of claim with respect to the balance of the demanded attorney's fees. Rule 13–401(c). The circuit court's order should not be interpreted to bar such a claim.

Further, the Department relies on *Hohensee v. Minear,* 253 Md. 5, 251 A.2d 588 (1969). There, the circuit court entered an order permitting limited attorneys' fees incurred by a trustee who conducted a foreclosure sale. The trial court expressly noted that the allowance of the attorneys' fees was " 'subject ... to any exceptions that might be noted with respect to the auditor's report.' " *Id.* at 6, 251 A.2d 588 (citation omitted). On appeal, the Court declined to address the issue because it was not a final and appealable order.

■ Ordinarily, " 'a party may only appeal from a final judgment, that is, a judgment that settles the rights of the parties *or* concludes the cause.' " *City of District Heights v. Denny,* 123 Md.App. 508, 518, 719 A.2d 998 (1998) (quoting *Town of Port Deposit v. Petetit,* 113 Md.App. 401, 409, 688 A.2d 54, *cert. denied,* 346 Md. 27, 694 A.2d 950 (1997))(emphasis added); *see Philip Morris Inc. v. Angeletti,* 358 Md. 689, 713, 752 A.2d 200 (2000); *Estep v. Georgetown Leather Design, Inc.,* 320 Md. 277, 282, 577 A.2d 78 (1990); *Shofer v. Stuart Hack Co.,* 107 Md.App. 585, 592, 669 A.2d 201 (1996). Md.Code (1974, 1998 Repl.Vol., 1999 Supp.), § 12–301 of the Courts and Judicial Proceedings Article ("C.J."). Maryland Rule 2–602 is relevant. It states, in part:

**Rule 2–602. Judgments not disposing of entire action.**

---

The proof of claim shall be filed within 120 days after the date the Notice to Creditors is issued by the clerk.

\* \* \*

(c) **Late filed claims.** (1) Before reference to auditor. A proof of claim that is filed late but before any reference to an auditor for the stating of an account is entitled to the same consideration for distribution as a timely filed proof of claim....

(a) Generally except as provided in Section (b) of this Rule, an order or other form of decision, however designated, that adjudicates fewer than all of the claims in an action (whether raised by original claim, counterclaim, cross-claim, or third party claim), or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all parties to the action:

■ is not a final judgment;

\* \* \*

■ Thus, to qualify as a "final and conclusive and thus appealable" ruling, *Brock v. American Mfrs. Mut. Ins. Co.*, 94 Md.App. 194, 199, 616 A.2d 458 (1992), an order must first be " 'intended by the court as an unqualified, final disposition of the matter in controversy.' " *Id.* (quoting *Albert W. Sisk & Son, Inc. v. Friendship Packers, Inc.*, 326 Md. 152, 159, 604 A.2d 69 (1992)). Second, the court must adjudicate " 'all claims against all parties.' " *Board of Liquor License Comm'rs v. Fells Point Café, Inc.*, 344 Md. 120, 129, 685 A.2d 772 (1996) (citation omitted). Third, for a judgment to be final, " 'the clerk must make a proper record of it in accordance with Md. Rule 2–601.' " *Carr v. Lee*, 135 Md.App. 213, 222, 762 A.2d 142 (2000) (citation omitted), *cert. denied,* 363 Md. 206, 768 A.2d 54 (2001). *See Rohrbeck v. Rohrbeck*, 318 Md. 28, 41, 566 A.2d 767 (1989); *B & P Enter. v. Overland Equip. Co.*, 133 Md.App. 583, 623, 758 A.2d 1026 (2000).

■ In its Order of July 26, 2000, the court awarded attorneys' fees to the Bank, but in an amount substantially less than had been requested. It also required appellant to release "all liens and security interests" against the Center upon the final payment of fees set forth in the Order. Even if, *arguendo,* the Order is an interlocutory one, that does not necessarily bar the appeal. C.J. § 12–303(3)(v) is relevant. It provides, in part:

§ **12–303. Appeals from certain interlocutory orders.**

A party may appeal from any of the following interlocutory orders entered by a circuit court in a civil case:

\* \* \*

(3) An order:

* * *

(v) For the sale, conveyance, or delivery

of real or personal property or the payment of money. . . .

In *Simmons v. Perkins*, 302 Md. 232, 486 A.2d 1192 (1985), the Court explained that " '[t]he history of § 12–303 . . . indicates a legislative intent to allow interlocutory appeals only from those orders for the "payment of money" which had traditionally been rendered in equity.' " *Id.* at 235, 486 A.2d 1192 (quoting *Anthony Plumbing of Md., Inc. v. Attorney General*, 298 Md. 11, 20, 467 A.2d 504 (1983)). The appealability of interlocutory orders for the payment of money has been held to include an order directing an assignee for the benefit of creditors in an insolvency proceeding to pay certain monies to a corporate creditor in order to discharge certain debts. *See Genn v. CIT Corp.*, 40 Md.App. 516, 392 A.2d 1135 (1978).

The "payment of money" cases that are appealable on an interlocutory basis have a "common thread," in that "each involves an order for a specific sum of money which 'proceeds directly to the person' and for which that individual is 'directly and personally answerable *to the court* in the event of noncompliance.' " *Anthony Plumbing*, 298 Md. at 20, 467 A.2d 504 (quoting *Della Ratta v. Dixon*, 47 Md.App. 270, 285, 422 A.2d 409 (1980)). In other words, the order has the "characteristics of a traditional equity order for the payment of money," rather than the characteristics of "a typical judgment at law for the payment of money." *Anthony Plumbing*, 298 Md. at 20, 467 A.2d 504; *see Simmons*, 302 Md. at 235, 486 A.2d 1192.

In our view, the Order in question here, issued in the underlying receivership case, falls within the purview of C.J. § 12–303(3)(v), because the circuit court ordered the Receiver to pay a portion of the Bank's attorneys' fees as part of the debtor's loan obligation. Therefore, we shall deny the Department's motion to dismiss the appeal.

## II.

Appellant argues that the court erred in failing to award the Bank all of its legal fees. It contends that, pursuant to the contractual terms of the loan documents, the Bank was entitled to recover the legal fees that it incurred in its effort to obtain payment from the Center.

The Department explains that Allfirst's demands for immediate payment of the Center's indebtedness led to the Bank's seizure of secured assets, and arguably "threatened the well-being of the developmentally disabled citizens entrusted to [the Center's] care...." As a result, H.G. § 19–333 to *et seq.* authorized the Secretary of the Department to seek the appointment of a receiver to protect the vulnerable persons residing in or served by the Center, a private care facility.

Relying on the terms of the statutory provisions and the legislative history of H.G. § 19–333 to *et seq.*, appellees contend that, in light of the receivership, Allfirst is not entitled to an award of counsel fees pursuant to the terms of its contract with the Center. Instead, they assert that the court had discretion as to the fee award, which was properly exercised. As they point out, the same judge presided at all four hearings and fully understood what had transpired. Appellees claim that, by limiting the award of legal fees to the period up to and including the first of four hearings, the court was mindful of the Bank's statutory right under H.G. § 19–337 to recover its secured debt, as well as the court's assurances to appellant that it would eventually recover both principal and interest with regard to the debt.

At the outset, we note that appellees have not challenged the court's award of attorneys' fees, in the full amount requested by appellant, for the period up to and including the first of four hearings held by the trial court in the receivership, even though appellant did not present any evidence to support how those fees were generated or calculated. Therefore, we will not review the propriety of the attorneys' fees awarded for that period. Instead, we shall focus only on the

court's unwillingness to award legal fees for services rendered after the first hearing held in the receivership proceeding.

Title 19 of the Health–General Article concerns "Health Care Facilities." Subtitle 3 is captioned "Hospitals and Related Institutions." We are concerned with Part V, titled "Receivership of Nursing Homes and Community Programs," §§ 19–333 to 19–339.

The receivership provisions were first enacted in 1980 as Senate Bill 579. At its inception, the purpose of the receivership provisions was to ensure the safety and well being of dependent individuals living in private nursing home facilities. The Legislative Comment to Senate Bill 579 states that "[t]his legislation would allow the Secretary of the Department of Health and Mental Hygiene to petition for a court-appointed receiver who could take over the management of a nursing home for a specified amount of time *without taking the very drastic step of forced closure and the attendant problems of patient transfer trauma.*" (Emphasis added). The legislation was amended in 1988, by Senate Bill 101, to include residential facilities for the developmentally disabled, *see* Fiscal Note to Senate Bill 101, and, in 1989, to cover facilities for disabled people in community day programs funded by the Developmental Disabilities Administration. *See* Senate Bill 168 (1989).

The general powers and duties of a receiver are set forth in Md.Code (1975, 1999 Repl.Vol.), § 3–414 of the Corporations and Associations Article ("C.A."). *See also* Maryland Rules 13–101 through 13–703 (governing receivership proceedings). Pursuant to H.G. § 19–337(a), a receiver in the case *sub judice* has the same general powers as a receiver under C.A. § 3–414. But, H.G. § 19–333 *et seq.* also includes specific provisions pertaining to a receivership for private care facilities such as the Center, in which the receiver has special responsibilities for the safety and welfare of individuals in care facilities.

Under H.G. § 19–337(f)(1), a receiver is specifically directed to pay principal and interest to a secured creditor in regard to a receivership initiated under H.G. § 19–333 *et seq.,* unless the

secured party is the owner of the facility or is affiliated with the owner. Of significance here, it omits any reference to an award of attorneys' fees to a secured creditor, pursuant to a contract or otherwise. Section 19–337(f)(1) states, in relevant part:

> (f) *Contracts.* (1) The receiver *shall* pay the principal of and interest on a mortgage or secured transaction unless the holder of the mortgage or the secured party is the owner or an affiliate of the owner.

(Emphasis added).

In addition, the statute provides for funding of the receivership estate by the State, either with previously designated funds, if available, or by petition to the Department of Public Works. H.G. § 19–338. Under certain circumstances, "State funds used to operate a receivership . . . shall be a lien on the community program and its assets. . . ." H.G. § 19–338(c). The lien "[h]as priority over any lien or other interest that attaches after" the requisite filings. H.G. § 19–338(c)(3)(ii).

■ Appellees have not identified any cases for us that provide that, despite the contractual agreement between the Center and the Bank obligating the Center to pay the Bank's legal fees in the event of the Center's default, the Bank is not entitled to recover its legal fees because of the receivership. We conclude that the absence of an express statutory authorization for the award of attorney's fees does not defeat the Bank's contractual right to recover an award of reasonable attorneys' fees.

■ The principles of statutory construction provide the initial framework for our resolution of the issue presented here. " 'The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.' " *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887 (1999)(quoting *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995)); *see also Roberts v. Total Health Care, Inc.,* 349 Md. 499, 523, 709 A.2d 142 (1998); *Mayor of Baltimore v. Cassidy,* 338 Md. 88, 93, 656 A.2d 757 (1995); *McGraw v. Loyola Ford, Inc.,* 124 Md.App. 560, 592, 723 A.2d 502, *cert. denied,* 353 Md. 473, 727

A.2d 382 (1999). As the Court said in *Martin v. Beverage Capital Corp.*, 353 Md. 388, 399, 726 A.2d 728 (1999), "[i]n determining legislative intent, we must never lose sight of the overriding purpose and goal of the statute."

To determine legislative intent, we look primarily to the statute itself. *Catonsville Nursing Home, Inc. v. Loveman*, 349 Md. 560, 570, 709 A.2d 749 (1998); *Allied Vending Inc. v. City of Bowie*, 332 Md. 279, 306, 631 A.2d 77 (1993). In doing so, "the Court considers the language of an enactment and gives that language its natural and ordinary meaning." *Montgomery County v. Buckman*, 333 Md. 516, 523, 636 A.2d 448 (1994); *see Lewis v. State*, 348 Md. 648, 653, 705 A.2d 1128 (1998); *Chesapeake and Potomac Tel. Co. v. Dir. of Fin.*, 343 Md. 567, 578, 683 A.2d 512 (1996). As the Court said in *Harris v. State*, 331 Md. 137, 146, 626 A.2d 946 (1993), "Giving the words their ordinary and common meaning 'in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence,' normally will result in the discovery of the Legislature's intent."

Generally, we may not read into a statute a meaning that is not expressly stated or clearly implied. *Amalgamated Cas. Ins. Co. v. Helms*, 239 Md. 529, 535–36, 212 A.2d 311 (1965); *Dep't. of Econ. and Employ. Dev. v. Taylor*, 108 Md.App. 250, 267, 671 A.2d 523, *aff'd*, 344 Md. 687, 690 A.2d 508 (1997). Moreover, when analyzing a statute, "we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State*, 336 Md. 125, 137, 647 A.2d 106 (1994); *see also State v. Thompson*, 332 Md. 1, 7–8, 629 A.2d 731 (1993) (courts must reach a statutory interpretation compatible with common sense).

Additionally, "[t]he consistent construction by [an] agency responsible for administering a statute is entitled to considerable weight." *Nat'l Asphalt Pavement Ass'n, Inc. v. Prince George's County*, 292 Md. 75, 80, 437 A.2d 651 (1981). That deference is premised on the notion that the agency has particular expertise in the area governed by the statute.

*Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 445, 697 A.2d 455 (1997). What the Court said in *Baltimore Gas & Elec. Co. v. Public Serv. Comm'n of Md.,* 305 Md. 145, 501 A.2d 1307 (1986), is pertinent here:

The weight to be accorded an agency's interpretation of a statute depends upon a number of considerations. Although never binding upon the courts, the contemporaneous interpretation of a statute by the agency charged with its administration is entitled to great deference, especially when the interpretation has been applied consistently and for a long period of time.

Another important consideration is the extent to which the agency engaged in a process of reasoned elaboration in formulating its interpretation of the statute. When an agency clearly demonstrates that it has focused its attention on the statutory provisions in question, thoroughly addressed the relevant issues, and reached its interpretation through a sound reasoning process, the agency's interpretation will be accorded the persuasiveness due a well-considered opinion of an expert body.

In addition, the nature of the process through which the agency arrived at its interpretation is a relevant consideration in assessing the weight to be accorded the agency's interpretation. *If the interpretation is the product of neither contested adversarial proceedings nor formal rule promulgation, it is entitled to little weight.*

*Id.* at 161–62, 501 A.2d 1307 (internal citations omitted)(emphasis added).

In this case, as best we can determine, the Department does not have any particular expertise with respect to the narrow issue regarding the availability of attorneys' fees. Nor was its interpretation of the statute the product of adversarial proceedings or rule promulgation.

Appellant contends that the statute's silence as to attorneys' fees in regard to recovery of a secured debt is not dispositive. According to the Bank, "[t]he filing of a receivership ... does

not vitiate a creditor's contractual rights." Relying on the terms of the loan documents, appellant maintains that the Center is contractually obligated to pay "attorney's fees, expenses of collection, and court costs."

The Department asserts that "an argument could be made that the absence of an attorney's fee provision [in the statute] deprived the circuit court of any power to award such fees." Indeed, as a matter of equity, it seems to contend that the trial court could have denied any award of legal fees, because of the need to conserve the estate for the benefit of the Center's clients. In the Department's view, "the circuit court took the moderate approach of awarding [legal] fees for Allfirst's legal actions taken before it [i.e., the court] had cautioned Allfirst, an approach within the sound discretion of the court."

For its part, the Center asserts in its brief that "[w]hile a valid agreement for the payment of attorneys' fees may be enforceable, the *amount* of attorneys' fees is nevertheless subject to review by the court." It maintains that the issue of attorneys' fees was a matter for the court in the exercise of its discretion.

Appellees rely on the legislative history of § 19–333 *et seq.*, which they claim "shows the General Assembly's intent to protect dependent individuals."[3] The Department observes that, at the legislative session in 1979, Senate Bill 152 was introduced and, had it passed, it would have created a statute similar to the present version of H.G. § 19–333 *et seq.*, but without the requirement for payment of secured creditors, now set forth in H.G. § 19–337. *See* Legislative Comment, Senate Bill 579. When the legislation was enacted in 1980, however, it contained a provision for payment of secured creditors. *See* 1980 Md. Laws, ch. 272, adding Md.Code Ann., Art. 43, § 560 B(D)(7)(IV)(1); Legislative Comment, Senate Bill 579, Comment 5.

---

**3.** In its brief, the Center adopts and incorporates the Department's arguments as to the legislative history.

Appellees attach great weight to the fact that H.G. § 19–337 is silent as to the payment of attorneys' fees, while expressly directing a receiver to pay principal and interest to secured creditors. In their view, if the Legislature had intended to authorize payment of attorney's fees to a secured creditor, pursuant to a contract, "it would have said so." Moreover, because the legislation assures payment to secured creditors, appellees maintain that this obviates the need for a secured creditor, such as Allfirst, to incur attorneys' fees to recover its debt. Thus, they maintain that H.G. § 19–337(f) "underscores the inappropriateness of Allfirst's legal efforts after the first hearing. . . ."

As the Department stated in its motion to dismiss, H.G. § 19–337(f)(1) "requires no proof of claim." But, the statute does not say how payment to a secured creditor is to be made or when it is to be made. Relying on H.G. § 19–337(f)(5), the Department asserts that a court has discretion to require installment payments of principal and interest with regard to a secured debt, which the court did in this instance. The Department does not explain why H.G. § 19–337(f)(5), which concerns rent, conferred discretion on the trial judge to permit payment of a secured debt by monthly installment. Indeed, if the court had required prompt compliance with H.G. § 19–337(f)(1), the Bank would not have had to incur legal fees to recover payment from the debtor.

Appellant refers us to 11 U.S.C. § 506(b), the federal counterpart to H.G. § 19–337(f)(1), which expressly permits the recovery of legal fees by a secured creditor. Section 506 of the federal bankruptcy code states, in relevant part:

**§ 506. Determination of secured status**

\* \* \*

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection(c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any *reasonable* fees, costs,

or charges provided under the agreement under which such claim arose.

11 U.S.C. § 506 (emphasis added). Appellees counter that the express inclusion of "reasonable fees, costs, or charges" in the federal law makes clear that the Maryland Legislature understood that it could have chosen to include a provision allowing for attorneys' fees in H.G. § 19–337(f)(1), and purposefully determined not to do so.

To support its position that the Legislature intentionally omitted any authorization for attorneys' fees, the Department points to the inclusion of such provisions in other statutes. The absence of express language permitting recovery of legal fees does not necessarily bar such recovery, however. *See,* e.g., *Blitz v. Beth Isaac Adas Israel Congregation,* 352 Md. 31, 44, 720 A.2d 912 (1998) (construing statutory authorization for recovery of "disbursements" in Maryland Uniform Arbitration Act to encompass attorneys' fees).

In analyzing the text of § 19–337(f)(1), we are mindful that, under the "American Rule," the prevailing party is not permitted to recover litigation expenses, including attorney's fees, as part of compensatory damages. *Hess Constr. Co. v. Board of Educ.,* 341 Md. 155, 159, 669 A.2d 1352 (1996); *Empire Realty Co., Inc. v. Fleisher,* 269 Md. 278, 285, 305 A.2d 144 (1973); *Bresnahan v. Bresnahan,* 115 Md.App. 226, 244, 693 A.2d 1, *cert. denied,* 346 Md. 629, 697 A.2d 913 (1997). *See also Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 263–64, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (holding that in the absence of statutory authorization or contractual agreement, under the American rule, each party in federal litigation must pay its own attorney's fees; when Congress has not explicitly authorized such fees, courts should not award them simply to further public policy). But, it is well settled that "[a]ttorney's fees may be awarded where a statute allows for the imposition of such fees, *and where parties to a contract have an agreement regarding attorney's fees.*" *Hess,* 341 Md. at 160, 669 A.2d 1352 (internal citations omitted)(emphasis added); *see Bresnahan,* 115 Md.App. at

244, 693 A.2d 1; *Maxima Corp. v. 6933 Arlington Dev. Ltd. P'ship,* 100 Md.App. 441, 452, 641 A.2d 977 (1994)("As a general rule, a trial court may award attorneys' fees only in the unusual situation where the trial court is [statutorily] authorized to award the prevailing litigant reasonable attorneys' fees or where, as more common, a contract between the parties specifically authorizes attorneys' fees."). Certainly, the General Assembly would have been well aware of the long standing legal doctrine that permits parties, by contract, to provide for the recovery of legal fees.

A stipulation in a promissory note to pay attorneys' fees is generally valid and enforceable. *Qualified Builders, Inc. v. Equitable Trust Co.,* 273 Md. 579, 584, 331 A.2d 293 (1975); *Travel Comm., Inc. v. Pan American World Airways, Inc.,* 91 Md.App. 123, 190, 603 A.2d 1301, *cert. denied,* 327 Md. 525, 610 A.2d 797 (1992). On the other hand, the right of parties to contract freely, in a manner consistent with the law, must be balanced against the court's duty to "protect the interests of the parties and others who may be affected by the resolution of the issues raised." *Noyes Air Conditioning Contractors, Inc. v. Wilson Towers Ltd. P'ship,* 122 Md.App. 283, 289, 712 A.2d 126 (1998). A receivership involving a regulated health care provider presents a situation in which the court must balance the rights of a secured creditor against the interests of others.

"What is allowable as a matter of law or what is allowable as a matter of discretion by the court in awarding damages does not always present a bright line distinction." *Noyes,* 122 Md.App. at 290, 712 A.2d 126. The Court of Appeals has identified a "mosaic" of doctrines that must be reconciled in considering the issue of attorneys' fees. *Id.* at 509, 712 A.2d 126. These are: (1) "the inherent power of a court to oversee the activities of members of its bar;" (2) "the rights of parties to make such contracts as they please, so long as they are consistent with law;" (3) "the duty of the courts to protect other creditors;" and (4) "recognition of the fact that an agreement to pay an attorney's fee is a contract of indemni-

fication." *Mortgage Investors of Washington v. Citizens Bank & Trust Co. of Md.,* 278 Md. 505, 508–509, 366 A.2d 47 (1976).

*Mortgage Investors* is instructive. It concerned the issue of "whether a court should consider the reasonableness of an attorney's collection fee when it is derived from an application of a percentage stipulated in a note to the amount of the recovery." *Id.* at 506, 366 A.2d 47. Mortgage Investors, a multimillion dollar real estate investment trust that made loans nationally to the real estate industry, had negotiated lines of credit with various banks, including the Citizens Bank and Trust Company of Maryland. *Id.*

In 1974, Mortgage Investors borrowed a total of $1,000,000 from Citizens, pursuant to two promissory notes, each of which contained a provision for the payment of attorneys' fees in the event of a default by the borrower, stating: " 'If upon our default, suit is instituted, we agree to pay all court costs and an attorney's fee of 15% of the outstanding balance at the time of the suit.' " *Id.* (citation omitted). When Mortgage Investors defaulted, Citizens instituted suit. A judgment for attorneys' fees was entered against Mortgage Investors, in the amount of $150,640.26, representing 15% of the balance due on the loans. But, pursuant to a contingent fee agreement with its lawyers, Citizens was actually obligated to its counsel for legal fees of $105,570.58. The question, then, was whether Mortgage Investors was required to pay Citizens $150,640.26, representing the stipulated amount, or, instead the actual amount of Citizens's legal fees.

On appeal, Mortgage Investors argued that a court "should not be insulated from determining the reasonableness of an attorney's collection fee by the fact that the amount of the fee or the percentage which the fee is to be determined is stipulated. . . ." *Id.* at 508, 366 A.2d 47. The Court upheld the right to a stipulated fee award, stating that "the collection fee stipulated in the note is collectible if a valid judgment is entered, and is not subject to reversal on judicial review in the factual situation before us unless a term such as 'reasonable fee' is substituted for a fixed sum or a percentage of the

amount recovered, or *unless the rights of other creditors of the debtor not parties to the fee arrangement are involved.*" *Id.* at 509–10, 366 A.2d 47 (internal citations omitted) (emphasis added). Because "the agreement [was] one of indemnity," however, Citizens was not entitled to collect from Mortgage Investors "an amount greater than the $105,758.58 which it was required to pay under its agreement with its attorneys." *Id.* at 510, 366 A.2d 47.

Although the Court acknowledged that the amount of attorneys' fees could be described as "grossly disproportionate to the amount of work involved," it also recognized that Mortgage Investors was an "informed and sophisticated borrower. . . ." *Id.* Nevertheless, the Court suggested that if parties with "dissimilar knowledge or background" contracted with one another, or there was "clear evidence of overreaching," a fee arrangement could be disturbed. *Id.* It also stated that "a fee might be denied in a case where the contemplated services were not rendered or where the amount stipulated was not paid to the creditor's counsel." *Id.*

We applied the reasoning of *Mortgage Investors* in *Noyes Air Conditioning Contractors, Inc., supra,* 122 Md.App. 283, 712 A.2d 126. There, the agents of an apartment complex entered into a contract for the replacement of two air conditioning units. The terms of the contract expressly stated: " 'Customer agrees to pay all *reasonable* collection fees, attorney's fees and court costs if such services are required and judgment is made against a customer.' " *Id.* at 288–89, 712 A.2d 126 (citation omitted)(emphasis added). After a disagreement over payment under the contract, the contractor instituted suit against the apartment complex to recover the balance due. At trial, the court awarded damages, but refused to award prejudgment interest, attorney's fees, or court costs, despite the express provisions in the contract. *Id.* at 288, 712 A.2d 126. On appeal, we considered the decision in *Mortgage Investors* and concluded that, "absent some identifiable misconduct such as fraud, overreaching, misrepresentation, or void as to other contractors," the trial court had discretion to decide the *amount* of the attorneys' fees and

costs, but lacked the discretion to deny the claim completely. *Id.* at 294, 712 A.2d 126. Therefore, we remanded for a determination of the reasonable amount of fees and costs.

As we see it, appellees' construction of H.G. § 19–337(f) would effectively subvert the long standing legal principle permitting parties to contract with regard to legal fees, without any express statutory directive to that effect from the General Assembly. Appellees rely on the absence of any language in the statute authorizing the award of legal fees. We rely, instead, on the absence of a prohibition. In the context of these receiverships, if the Legislature wanted to bar the contractual recovery of legal fees by a secured creditor, it would have said so. The omission of such a prohibition indicates that the Legislature did not intend to relieve the debtor of an agreement to pay legal fees. Therefore, to the extent that appellant sought to recover its legal fees in accordance with its contract, it was not necessarily barred from such recovery on the ground that the Center was in receivership.

 In the absence of a clear statutory directive, or legislative history that establishes the Legislature's intent to supersede the parties' contractual agreement regarding legal fees, we apply the fundamental principle of statutory construction that disfavors judicial embellishment of a statute. *See In re Charles K,* 135 Md.App. 84, 97–98, 761 A.2d 978 (2000) (stating that the Court is prohibited from "embellishing a provision so as to enlarge its meaning"); *Rouse–Fairwood Ltd. P'ship v. Supervisor of Assessments of Prince George's County,* 120 Md.App. 667, 688, 708 A.2d 19 (1998)(stating that the Court may not "embellish a statute to expand its meaning"); *Abington Ctr. Assoc. Ltd. P'ship v. Baltimore County,* 115 Md.App. 580, 603, 694 A.2d 165 (1997) (stating that the Court is prohibited from "read[ing] into a statute a meaning that is not expressly stated or clearly implied"; it may not "embellish a statutory provision so as to enlarge its meaning").

This leads us to consider the amount of the fee award. The Note does not provide for reasonable attorneys' fees or pay-

ment of attorneys' fees in an amount equal to an arbitrary percentage of the outstanding debt. Rather, it obligates the Borrower to pay "the holder's attorney's fees." In contrast, although not discussed by the parties, we observe that the Security Agreement provides for attorneys' fees equal to 15% of the unpaid balance. It appears, however, that Allfirst sought to recover the actual amount of the fees that it incurred.

Generally, when attorneys' fees are based on a "contractual right, the losing party is 'entitled to have the amount of fees and expenses proven with certainty and under the standards ordinarily applicable for proof of contractual damages.' " *Maxima Corp. v. 6933 Arlington Dev. Ltd. P'ship,* 100 Md.App. at 453, 641 A.2d 977 (quoting *Bankers & Shippers Ins. Co. v. Electro Enter., Inc.,* 287 Md. 641, 661, 415 A.2d 278 (1980)(emphasis added)); *see B & P Enter. v. Overland Equip. Co., supra,* 133 Md.App. at 624, 758 A.2d 1026. A "trial court's evaluation of a claim for attorneys' fees must be based on a record that includes information that sufficiently and competently supports the court's findings." *Maxima Corp.,* 100 Md.App. at 458, 641 A.2d 977. Generally, a trial court enjoys discretion in regard to the award of attorneys' fees when an agreement obligates the losing party to pay the attorney's fees of the prevailing party. *See Rauch v. McCall,* 134 Md.App. 624, 636, 761 A.2d 76 (2000), *cert. denied,* 362 Md. 625, 766 A.2d 148 (2001); *Holzman v. Fiola Blum, Inc.,* 125 Md.App. 602, 637, 726 A.2d 818 (1999); *Milton Co. v. Council of Unit Owners of Bentley Place Condo.,* 121 Md.App. 100, 121, 708 A.2d 1047 (1998), *aff'd.,* 354 Md. 264, 729 A.2d 981 (1999); *Kilsheimer v. Dewberry & Davis,* 106 Md.App. 600, 621, 665 A.2d 723 (1995), *cert. denied,* 341 Md. 406, 671 A.2d 20 (1996).

In *Zachair, Ltd. v. Driggs,* 135 Md.App. 403, 433–34, 762 A.2d 991 (2000), *cert. denied,* 363 Md. 206, 768 A.2d 54 (2001), we stated that the general rule for proving the proper award of attorneys' fees requires that

"(a) the party seeking the fees, whether for him/herself or on behalf of a client, always bears the burden of presenting evidence sufficient for a trial court to render a judgment as to their reasonableness; (b) an appropriate fee is always reasonable charges for the services rendered; (c) a fee is not justified by a mere compilation of hours multiplied by fixed hourly rates or bills issued to the client; (d) a request for fee must specify the services performed, by whom they were performed, and the hourly rates charged; (e) it is incumbent upon the party seeking recovery to present detailed records that contain the relevant facts and computations undergirding the computation of charges; (f) without such records, the reasonableness, vel non, of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence."

(quoting *Rauch,* 134 Md.App. at 639, 761 A.2d 76); *see B & P Enter.,* 133 Md.App. at 625, 758 A.2d 1026.

▇▇▇ Regardless of whether appellant's legal fees are governed by the terms of the Note or the terms of the Security Agreement, we conclude that appellant is only entitled to recover attorneys' fees that are reasonable. As the Court recognized in *Mortgage Investors, supra,* 278 Md. 505, 366 A.2d 47, even a fixed percentage for the award of attorneys' fees may give way in those situations involving "the rights of other creditors of the debtor not parties to the fee arrangement are involved." *Id.* at 510, 366 A.2d 47. This case presumably involves other creditors. But even more significant, an essential purpose of the receivership under H.G. 19–333 *et seq.* is to provide stability to a private care facility, like the Center, in order to protect the interests of the disabled individuals in its care. Because the lives of many disabled persons might be severely disrupted if the Center were to collapse, the receivership proceeding was instituted. A receiver has the power to perform all acts necessary to "[c]orrect each condition on which the appointment of the receiver was based"; "[e]nsure adequate care for each individual in the nursing home or community program"; and "[p]reserve the

property of the owner of the nursing home or community program." H.G. § 19–337(a)(2). A secured creditor's right to be made whole must be balanced against this important issue of public concern.

*Rauch*, a domestic case, is also instructive. There, the parties' fee agreement did not provide for the award of legal fees equal to a fixed percentage, nor did it contain a limitation that the fees must be reasonable. In reviewing the legal fees, the Court noted that no appellate decision in Maryland addressed the question of whether a contractual duty to pay attorney's fees, without mention of the term "reasonableness," nonetheless implicitly required an analysis of reasonableness. *Id.* at 638, 761 A.2d 76. We were "persuaded that the trial judge must enforce the contractual standard set forth in the [parties'] Agreement, but *from a reasonableness standpoint."* *Rauch,* 134 Md.App. at 636, 761 A.2d 76 (emphasis added). *See also Brown & Sturm v. Frederick Road Ltd. P'ship,* 137 Md.App. 150, 181, 768 A.2d 62 (2001) (stating that, with respect to a contingent fee agreement, " 'the fact that the client agreed to the [amount of the fee] does not relieve the attorney from the burden of showing that the amount agreed upon was fair and reasonable' ") (citation omitted) (alteration in original); *B & P Enter.,* 133 Md.App. at 625, 758 A.2d 1026 (stating that after a claimant presents evidence to support an award of attorneys' fees, "the trial court must evaluate the reasonableness of the fees"); *Maxima Corp.,* 100 Md.App. at 454, 641 A.2d 977 (stating that after the party seeking recovery presents the court with facts to support the payment of attorneys' fees, "the trial court must still evaluate the reasonableness of the fees"; the party seeking recovery bears the burden "to provide the evidence necessary for the fact finder to evaluate the reasonableness of the [attorneys'] fees"); *Walker v. Haywood,* 65 Md.App. 1, 14, 498 A.2d 1198 (1985)(stating that the court will generally enforce a trust instrument that includes payment of attorney's fees in a specific amount or in percentage terms, unless "the amount designated is grossly in excess of any reasonable amount").

*See also* Rule 1.5(a) of the Maryland Rules of Professional Conduct (providing that "A lawyer's fee shall be reasonable").

What the Court of Appeals said in *Plakatoris v. Bainder*, 204 Md. 223, 229, 103 A.2d 839 (1954), in the context of a receiver's fee award, is also noteworthy.

> *One of the most delicate duties a court is called upon to perform is that of fixing the fees of the attorneys in cases in which they are entitled to be paid out of a fund or estate under the jurisdiction of the court.* There is no standard formula or specific guide for fixing the amount of the counsel fee to be allowed the attorney for a receiver. While the amount of the allowance for fees in a receivership lies in the sound discretion of the court in which the receivership proceedings occur, *the allowance should be reasonable according to the circumstances of the case.* The considerations which should control in fixing the counsel fee are the value of the property in controversy; the legal difficulties encountered; time, labor, and skill required and experience in the *proper performance of the duties imposed;* the fair value of the services measured by common business standards; the particular benefit derived from the receiver's attention and efforts in the interest of the estate; and the degree of integrity and dispatch with which the work of the receivership is conducted.

(Emphasis added); *see also County Corp. of Md. v. Semmes,* 169 Md. 501, 527, 182 A. 273 (1936); *Great Nat'l Ins. Co. v. Empire Fire Ins. Co.,* 165 Md. 510, 517, 170 A. 165 (1934).

██ Based on the foregoing, we are of the view that the court did not err to the extent that it determined that appellant was entitled to an award of reasonable attorneys' fees, rather than *all* of its attorneys' fees, pursuant to its contract with the Center. On the other hand, we conclude that the court abused its discretion to the extent that it determined that appellant was not entitled to any legal fees after the first court hearing in the receivership proceeding, because the services were unnecessary and counterproductive in light of

the court's assurance that appellant would recover both principal and interest as to the Center's debt.

The Department observes that H.G. § 19–338(a) authorizes State funding for receiverships of the kind involved here, which "reflects the special role of the Department in encouraging enough private providers to continue to exist to serve the needs of the disabled...." Nevertheless, the Department concedes that H.G. § 19–338(a) "did not guarantee that the Caroline Center would be able to pay off Allfirst notwithstanding the receivership...." At best, the Department maintains that the statute "lent credence" to the court's "assurances to Allfirst at the first hearing that the [B]ank would be made whole."

The Department's concession leads us to conclude that we cannot quarrel with the Bank's persistent attempt to expedite and assure the collection of its debt. Moreover, at least some of the work of the Bank's attorney was directed to the receiver's fee petitions. Considering that the Receiver submitted several fee petitions for itself, while the Center was allegedly losing money and appellant's debt was still outstanding, it was not necessarily unreasonable for the Bank to contest the Receiver's fee petition. Nor was it necessarily unreasonable for the Bank to oppose the Receiver's Extension Petition, which might have further delayed payment of the Bank's debt, allegedly "secured by fleeting assets of an unprofitable enterprise." Similarly, had the Bank opted not to attend the hearing on July 25, 2001, scheduled with regard to the Extension Petition, the Receiver might have prevailed in its request in the Payment Petition to avoid payment of any legal fees to Allfirst.

In short, it was not unreasonable for the Bank to keep abreast of developments, attempt to expedite recovery of the money it was owed, or maintain a watchful eye on the Receiver's conduct, given its status as a secured creditor with a statutory entitlement to payment of its debt, when the statutory provision had not yet been met. Indeed, the Bank's efforts

culminated in a decision by the Receiver to satisfy the Bank while also seeking to extend the receivership.

Although the Bank was not obligated to sit back and do nothing, as the court seemed to think, given its "assurance" that the Bank would eventually collect its debt, we agree with appellees that the court was not required to accept "uncritically" Allfirst's request for attorneys' fees. If that were the case, an unscrupulous attorney might file unnecessary motions, objections, or requests for hearings merely to better his or her own position, or the debtor might be forced to bear expenses generated because the attorney was unfamiliar with the area of law. Therefore, the court must be satisfied of the reasonableness of the fee request, in light of the nature of the receivership proceeding, the legal issues, and the extent to which other creditors have an interest in the debtor's estate.

Accordingly, we shall vacate the award of attorneys' fees and remand for further proceedings consistent with this opinion. On remand, the court may take into account the amount of its prior fee award. Our opinion should not be construed to suggest that we believe the court is required to accept as reasonable the full amount of fees incurred by Allfirst.

In view of our resolution of the case, we need not consider the Bank's due process contention.

**ORDER OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEES.**