894 A.2d 584

Audrey WALTON, et al.

v.

MARINER HEALTH OF MARYLAND, INC.

No. 33, Sept. Term, 2005.

Court of Appeals of Maryland.

March 14, 2006.

Benjamin J. Woolery (McGill & Woolery, on brief), of Bowie, Ron M Landsman (Ron M. Landsman, P.A. on brief), of Rockville, for appellants.

Norman L. Smith, Fisher & Winner, LLP, Baltimore, for Brief of Amicus Curiae Maryland Chapter of the National Academy of Elder Law Attorneys in Support of appellants.

David F. Clinnin of Towson (Kenneth L. Rosen on brief), of Baltimore, for appellees.

John F. Lessner, Howard L. Sollins, Ober, Kaler, Grimes & Shriver, A Professional Corporation, Baltimore, for Brief of Amicus Curiae Health Facilities assocciation of Maryland.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

This case primarily involves a review of the laws of agency and contracts and the rules of statutory interpretation. Although Patricia Walton ("Patricia") and Audrey Walton ("Audrey") are both named parties in this case, the issue before us is whether Patricia, an agent for Audrey, can be held personally liable for Audrey's outstanding debt. On January 10,

2003, Mariner Health of Southern Maryland ("Mariner Health"), a nursing home facility, sued Patricia, as agent, and her mother, Audrey, for breach of contract for failing to pay Audrey's nursing home bill as allegedly agreed to by the parties. On August 11, 2004, the Circuit Court for Prince George's County found both mother and daughter liable to Mariner Health for the outstanding balance incurred by Audrey and for attorney fees. The Waltons appealed that decision to the Court of Special Appeals. Before that court could decide the appeal, we granted *certiorari*. *Walton v. Mariner Health*, 388 Md. 97, 879 A.2d 42 (2005).

We must determine whether a contract between an agent, on behalf of the nursing home resident, and a nursing home facility, entitles the nursing home to a private cause of action against an agent for the cost of the resident's care. If an agent neglects his or her duty to apply for Medicare or Medical Assistance [1] on behalf of the resident under Maryland Code (1982, 2000 Repl.Vol.), § 19–344(c) of the Health–General Article, can the agent be held personally liable for the debt incurred by the resident of the nursing home? We must also resolve whether § 19–344(c) of the Health–General Article limits a nursing home facility to statutory remedies or if it may pursue a private cause of action against an agent for personal liability for an outstanding debt incurred by the resident.

We reverse the judgment of the Circuit Court for Prince George's County. The Circuit Court erred in holding that the financial agreement signed by the agent on behalf of the resident rendered the agent personally liable for the outstanding nursing home bill [2] even though the agent failed to seek Medicare or Medical Assistance for the resident. In addition,

---

1. For purposes of this opinion and the agreement signed between Mariner Health and Patricia, Medicaid means "Medical Assistance."

2. Unless the agent expressly indicated in the contract that he/she knowingly and voluntarily would pay for the resident's care with the agent's own funds, the agent is not personally liable for the principal's contract or debt.

we hold that a nursing home facility is limited to remedies prescribed by statute.

## FACTS

On January 26, 2001, Audrey was transferred from Southern Maryland Hospital Center to Mariner Health of Southern Maryland. That same day, Patricia, as an agent of Audrey, signed the Resident's Agent Financial Agreement with Mariner Health of Southern Maryland ("Agreement"). Patricia indicated in the agreement that the only methods of payment would be Medicare or Medical Assistance. In the agreement, Patricia expressly denied any personal responsibility for Audrey's bill. When Audrey was admitted to the facility, Medicare paid for Audrey's nursing home bill, however, at the end of February, 2001, Medicare stopped paying for Audrey's nursing home care. Patricia, as agent, was required, as stipulated in the agreement, *infra* at note 9, to reapply for eligibility or Medical Assistance. There was testimony that Audrey would have been a successful candidate for Medical Assistance and, most likely, Medicare. From March 2001 through August 2002, Audrey incurred a debt of approximately $4,800.00 a month for her care. The outstanding balance was $86,235.91 for those eighteen months. On January 10, 2003, Mariner Health filed a Complaint against Patricia and Audrey for Audrey's outstanding bill. The amount requested by Mariner Health was $86,235.91, representing the outstanding balance due and owing, plus $12,935.39 in attorney fees.

On July 6, 2004, Patricia testified at trial that she was not aware that Medicare ceased paying for her mother's care and that the nursing home debt was being incrementally calculated. Patricia stated that she would have applied for medical benefits for her mother had she been aware that Medicare had stopped paying for Audrey's nursing home bill. Patricia testified that she was not given notice of the outstanding monetary obligation until after Mariner Health sold the facility to another group. Mariner Health offered no explanation or evidence as to why it failed to notify Audrey or Patricia

that Medicare had ceased paying or that a debt had been incrementally tallied for eighteen months.

The trial judge interpreted two provisions of the agreement and, based on that interpretation, held that both Patricia and Audrey were contractually obligated for paying Mariner Health for Audrey's nursing home bill, but reserved judgment on damages for a compromise by the parties. On August 11, 2004, after the parties failed to settle the issue of damages, the court entered a judgment against both women and in favor of Mariner Health for damages in the amount of $75,000.00 and $11,250.00 for attorney fees.

## RESIDENT AGENT'S FINANCIAL AGREEMENT

In the case, *sub judice*, the agreement consists of thirty pages collectively. The Resident's Agent Financial Agreement identified in the Circuit Court record as exhibit one (1) consisted of "The Financial Agreement With Mariner Health of Southern Maryland" ("Financial Agreement") and "Exhibit 1 Obligations of the Agent." Both agreements contained the agent, Patricia Walton's signature. The Financial Agreement consisted of twenty-two pages and "Exhibit 1 Obligations of the Agent" was eight (8) pages long.[3] Both of the agreements contained several provisions pertinent to our discussion.

## FINANCIAL AGREEMENT WITH MARINER HEALTH

The Financial Agreement that Patricia signed was an agreement between an agent on behalf of a resident and Mariner Health. The contract explained a resident's agent's rights and obligations and required that the agent select the type of financial program responsible for paying for the resident's care. Several payment options were provided including Medicare and Medical Assistance, other third party insurers, the resident's personal funds, the agent's personal funds, and

---

**3.** In the trial record, the page numbers of the "Obligations of the Agent" agreement were not clearly marked or discernable, except for page one (1).

other methods of payment.[4] The relevant provision in the Financial Agreement that clearly qualified Patricia as a statutory agent, as defined in § 19–344(c)(1), was as follows:

This Contract is between Mariner Health of Southern Maryland ... and *Patricia Walton* (the "Agent" or "you") because you have access to (use, management or control of) the income, funds and/or assets *of Audrey Walton* (the "Resident") and because you are willing to act on behalf of the Resident.[5]

Financial Agreement at 1.

Patricia signified that both "The Medicare Program" and "The Medicaid Program" (also known as "Medical Assistance") would pay for Audrey's care by marking an "X" in the appropriate boxes. Patricia did not indicate that she would be liable for payment for Audrey's care from her own personal funds or that payment would be made from Audrey's personal assets:

3. ... A. *Who Can be Required to Pay for the Resident's Care.*

Only the Resident and the Resident's insurers can be required to pay for the Resident's care. You cannot be required to pay for the Resident's care *from you own funds,* unless you knowingly and voluntarily agree to pay for the cost of the Resident's care with your own funds.

\* \* \* \*

It is anticipated that the Resident's care will be paid for by:

---

4. Further, the Financial Agreement contained seven sections. Some sections contained several subsections. Importantly, in this case, sections 3 A–D are relevant since several payment requirements are profiled, specifically; (i) 3.A. *Paying for The Resident's Care,* allows the agent to pick the payment type, and, here, Patricia indicated that only Medicare or Medical Assistance would pay for her mothers care; (ii) 3.B. *Private Pay Residents,* was applicable to those residents who paid for their care with their own income, funds, and/or assets; and 3.C. *Medicare Residents* and 3.D. *Medicaid Residents,* both pertained to those residents, such as Audrey, who indicated, *supra* at 6, that Medicare or Medicaid (Medical Assistance) benefits would pay for their care.

5. Patricia and Audrey Waltons' names were handwritten.

☒ The Medicare Program;

☒ The Medicaid Program (also known as "Medical Assistance);

☐ Other third-party insurer, . . .

☐ You with the Resident's income, funds and/or other assets;

☐ You with your own income fund and/or assets;

☐ Other . . . .

Financial Agreement at 4.

Section "3.B *Private Pay Resident*," contained information on specific payment and service requirements for residents paying with their own private funds.[6] Although Audrey was not a Private Pay Resident, this section is relevant to our discussion because the trial judge based his judgment on language contained within this section. The pertinent language in this section provided that:

You [as an agent to a Private Pay Resident] understand and agree that you are responsible for paying the Facility . . . during which [time] the Resident has not been determined eligible for Medical Assistance. If you do not pay the amount owed us after receiving Facility bills and we hire a collection agency or attorney because of your breach of this Agreement, you agree to pay their fees, expenses and court costs with your own funds.

If you do not pay what is owed the Facility, you agree to apply to Medical Assistance for a determination of the Resident's income and assets available to pay the cost of the Resident's care. Once Medical Assistance determines the income and assets available to pay for the Resident's care, you agree to use such income and assets to pay the Facility's bills.[2] (Your request for this determination is not the same as applying for Medical Assistance on behalf of the Resident.)

---

**6.** When a nursing home consents to payment from a nursing home resident's private funds, it means "a nursing facility's acceptance of payment from a source other than the Medical Assistance Program." COMAR 10.07.09.02 § B(21)(a).

[2] If you do not request a determination by Medical Assistance, or if payment is not made with the income and assets determined to be available for the Resident's care, the Facility may ask the court to order you to obtain the determination or to make payment.

Financial Agreement at 5–6.

Audrey's care was not paid for by Medical Assistance because Patricia, as agent, did not apply for Medical Assistance, when Medicare stopped paying her mother's bill. In section "3.D *Medicaid Residents*" of the agreement, the first sentence began, "[] [Mariner Health] participate[s] in the Medicaid Program." The following in relevant part states that

[] [a]lthough it is the Resident's and your responsibility to apply for and obtain Medicaid benefits for the Resident, we will assist you, by promptly providing Medical Assistance with all required information in our possession. If a Resident is eligible for Medical Assistance, the Facility may not charge, ask for, accept or receive any gift, money, donation or consideration other than Medicaid reimbursement as a condition of the Resident's admission or continued stay here.

\* \* \* \*

[] ... You understand and agree to pay to the Facility ... this ... amount.... If you fail to pay this amount, we may request a court to order such payment.

\* \* \* \*

[] You understand that non-payment of items and services not covered by Medicaid may result in a discharge action for non-payment of bills.

Financial Agreement at 8–9.

## OBLIGATIONS OF THE AGENT

The addendum to the Financial Agreement titled, Exhibit 1, Obligations of the Agent, (hereinafter "Agent Obligation

Form") provided, as the title indicated, a resident's agent's responsibilities. The second page of the addendum contained a statement which said, "[p]lease initial those questions which describe your authority for acting as the Resident's Agent." Patricia initialed that she was acting as an agent "[a]t the request of the Resident [her mother, Audrey][]" and "[a]s a family member . . . with authority to manage, use or control the Resident[']s income, funds and/or assets[]" Agent Obligation Form at 2.

Further, in pertinent part, the document provided that

[t]he financial obligation is limited to the amount of the Resident's income, funds and assets. The Agent assumes no personal liability for the Resident's stay at the Facility unless the Agent voluntarily agrees to be personally responsible for any payments required under this Contract which are not paid by the Resident or a third-party insurer.

Agent Obligation Form at 1.

An agent who intentionally or "with gross negligence" failed to apply or request a determination for Medical Assistance would be subject to penalties:

I understand that I could be subject to both civil and criminal penalties for failure to meet my obligations as an Agent as follows:

\* \* \* \*

2. If I willfully or with gross negligence fail to seek on behalf of the Resident all assistance from Medical Assistance which may be available to the Resident, or fail to cooperate fully in the eligibility determination process, I understand that I could be subject to a civil money penalty of up to $10,000.00. This amount would be paid from my own funds.

Agent Obligation Form at 4–5.

Further Patricia's handwritten initials, "PW" signified that she would not use her own personal funds for her mother's care:

1. Do you knowingly and voluntarily agree to make payments required under this Agreement from YOUR OWN RESOURCES? Yes ___/ No *PW* . . . .

Agent's Obligation Form at 6.

## ANALYSIS

### Agency Law

Mariner Health asserts that Patricia, as agent, was obligated to apply for Medical Assistance and she breached that duty. Therefore, she is personally liable (along with Audrey) for the total sum owed to the nursing home facility for Audrey's care.

Patricia contends that under the agreement she, as an agent for Audrey, had two statutory and contractual obligations to Mariner Health. The first obligation was to use the Audrey's assets and income to pay for her care. The second obligation was to apply for Medical Assistance. Patricia maintains that to hold a nursing home resident's "agent" personally liable for a resident's outstanding nursing home bill requires more than a signed agreement or an agent's simple failure to obtain Medical Assistance benefits.

The Financial Agreement established Patricia as a statutory agent under § 19–344(c). An agent, in these types of situations, often a relative of a nursing home resident, manages the resident's finances or acts on behalf of an elderly or ill relative. In 1988, the Legislature enacted legislation to limit the liability of an agent to a nursing home residence. The Legislature defined an agent as, "a person who manages, uses, or controls the funds or assets that legally may be used to pay the applicant's or resident's share of costs or other charges for the facility's services." Section 19–344(c)(1) of the Health–General Article. An agent is, "[o]ne who is authorized to act for or in place of another—a representative." BLACK'S LAW DICTIONARY 68 (8th ed.2005).

■ An agent's function is to represent the rights of the principal. An agent's authority is limited by the instructions,

restrictions and needs of the principal. *Penowa Coal Sales Co. v. Gibbs & Co.*, 199 Md. 114, 119, 85 A.2d 464, 467 (1952); *Proctor v. Holden*, 75 Md.App. 1, 20, 540 A.2d 133, 142; *cert. denied, Holden v. Freeman & Kagan*, 313 Md. 506, 545 A.2d 1343 (1988) ("Three elements are integral to any agency relationship: (1) the agent is subject to the principal's right of control, (2) the agent has a duty to act primarily for the benefit of the principal, and (3) the agent holds a power to alter the legal relations of the principal.").

An agent has the authority to enter into a contract on behalf of the principal. *Strawn v. Jones*, 264 Md. 95, 98, 285 A.2d 659, 662 (1972) ("It is well established law that an agent can enter into a contractual relationship with a third party to the extent of the agent's prescribed authority."). Further, "an agent is employed to represent his principal in regard to contractual obligations with a third person." *Henkelmann v. Metropolitan Life Ins. Co.*, 180 Md. 591, 600, 26 A.2d 418, 423 (1942).

If the contract is to benefit the principal only, the agent is immune from personal liability for breach of that contract. *City of Baltimore v. Musgrave*, 48 Md. 272, 289 (1878) ("It is also a universal principle of the law of agency that the powers of the agent are to be exercised for the benefit of the principal only, and not of the agent or third parties."); *Local 1852 Waterfront Guard Ass'n of Port of Baltimore I.W.A. v. Amstar Corp.*, 363 F.Supp. 1026, 1030 (1973), *enforced*, 508 F.2d 839 (1974), *cert. denied*, 421 U.S. 1000, 95 S.Ct. 2398, 44 L.Ed.2d 667 (1975) ("It is a well settled principle of agency law that an agent acting within the scope of his authority for a disclosed principal is not bound on a contract made in the principal's name."); *Curtis G. Testerman, Co. v. Buck*, 340 Md. 569, 576–77, 667 A.2d 649, 653 (1995) ("The rule in Maryland is clear that, 'if an agent fully discloses the identity of his principal to the third party, then, absent an agreement to the contrary, he is insulated from liability.'") (quoting *A.S. Abell Co. v. Skeen*, 265 Md. 53, 56, 288 A.2d 596, 597–98 (1972)); *King v. Industrial Bank of*

*Washington,* 474 A.2d 151, 155 (D.C.1984) ("The designation of the signer as an agent and the naming of the principal are essential to the avoidance of liability on negotiable and nonnegotiable contracts alike."); *Rittenberg v. Donohoe Const. Co., Inc.,* 426 A.2d 338, 341 (D.C.1981) ("Where a principal is disclosed, no liability will fall upon the agent for acts committed by the principal unless he binds himself for same by definite words or stipulation."); *Henderson v. Phillips,* 195 A.2d 400, 402 (D.C.) (1963) ("[W]hen his principal is disclosed ..., the agent ordinarily does not incur personal liability. The law is well settled that when an agent acts in good faith on behalf of a disclosed principal, he is not held responsible in the event of his principal's default.").

■ Patricia, as an agent, had a primary duty to Audrey, the principal, and Patricia's duty to Mariner Health, a third party, was limited. Agency law precludes a finding against Patricia for damages. As an agent, Patricia entered into the contract only for the benefit of Audrey and is personally insulated from liability by virtue of her station as an agent. The issue remains however of whether Patricia, as an agent, was personally immune from liability under the terms of the contractual agreement or the statute.

### The Agreement

Mariner Health maintains that although Patricia was an agent, she was, nevertheless, personally liable for the nursing home bill under an apparent "privity of contract" [7] theory because a contract existed between Mariner Health and Patricia. In its Complaint, filed in the Circuit Court, Mariner Health asserted that Patricia agreed that when Audrey's funds were exhausted, Patricia would seek medical assistance promptly and provide all necessary information and documentation requested to establish Medicare eligibility for her mother. Mariner Health contends that the trial court found Patricia had a contractual obligation, under a contract which was

---

7. Privity of contract means a, "relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so." BLACK'S LAW DICTIONARY at 1237 (8th ed.2004).

approved by "DHMH," [8] to pay for Audrey's care using the resident's funds or applying for Medical Assistance.[9] Mariner Health asserts that Patricia, as agent, disregarded her duty to apply for medical assistance, therefore she is personally liable for the costs incurred for her mother's care.

Patricia specified in the agreement that Audrey's care would be paid solely from Medicare or Medical Assistance.[10] Patricia states that she, as an agent, cannot be held personally liable for Audrey's outstanding nursing home bill because she explicitly indicated in the agreement that she would not "knowingly or voluntarily" use her own personal funds for her mother's care. Patricia asserts that Mariner Health breached its duty to mitigate damages,[11] and its contractual duty to

---

**8.** Mariner Health argues that the contractual language expressly stated that an agent would be personally responsible if she or he failed to apply for medical assistance or make payment with the income or assets available for the resident's care. All Maryland nursing home admission contracts must be approved by the DHMH to ensure that they fall within the parameters of public policy. The Mariner Health Resident's Agent Financial Agreement was approved the DHMH. Financial Agreement at 5.

**9.** At trial, Mariner Health's counsel acknowledged that Audrey was eligible for Medicare, stating, "I don't deny that [Audrey] had Medicare benefits" and "had medical assistance been applied for, we wouldn't be here today."

Mariner Health stated that neither Patricia nor Audrey contacted Prince George's Department of Social Services for Medical Assistance. Mariner Health admitted that it had a duty to advise the family to apply and assist them in seeking medical assistance, however did not admit that it breached that duty:

THE COURT: If I understand your testimony correctly ... [Mariner Health] really doesn't oversee the initiation of a Medicaid request.... That would be the department of social services for that jurisdiction. Is that right?

MARINER HEALTH WITNESS: Correct. The nursing homes d[o] not make that decision. They advise [the] family to apply. They may assist them in getting some to the documentation, "but they have to make that face to face appointment with the local department."

**10.** Medicare had paid for Audrey's care initially through February 2001.

**11.** Patricia argues that Mariner Health failed in its duty to mitigate damages when it did not notify them for eighteen months that Medicare

advise and assist Patricia with applying for Medical Assistance.

The trial judge held that the Resident's Agent Financial Agreement was clear and provided that Patricia, as agent and relative for her mother, was responsible to pay her mother's expenses as outlined in several provisions. The trial judge continued:

The focus of this [c]ourt is [Mariner Health's] Exhibit Number 1, which is the [R]esident[']s [A]gent [F]inancial [A]greement with Mariner Health ... and then the evidence that's been presented as to everybody's understanding of this agreement.

This agreement does speak for itself. It is in evidence, and it states that Patricia Walton has signed in her capacity as a relative and agent of her mother [and is] obligate[d] ... for the financial obligations stemming from services rendered while her mother was living at the Mariner Health Care facility in southern Maryland.

Page four of the agreement has been referenced indicating that it is the anticipation that the resident's care will be paid by [M]edic[aid] ... or the Medicare program. Those are the two blocks that were checked off.

I have reviewed this agreement. And I point out among[] other provisions ... at the bottom of page five, the last of the page reads in part,[12]

['][y]ou understand and agree that you are responsible for paying the [F]acility for items [and services] provided to the resident during any period of time in which the [R]esident is or was a resident of the [F]acility and during

---

had ceased paying for Audrey's nursing home care or that a debt was accruing every month for eighteen months. Instead Mariner Health did nothing for eighteen months as a small manageable debt, which could have been easily remedied by applying for Medical Assistance, became a debt of a large significance in which the time to apply for Medical Assistance had passed.

12. The indented language was quoted by the trial judge from the agreement.

which the resident has not been determined eligible for [M]edical [A]ssistance. If you do not pay the amount owed us after receiving [F]acility bills, and we hire a collection agent or attorney because of your breach of this agreement, you agree to pay their fees, expenses, and court costs with your own funds.['] [13]

There is a footnote at page six that reads,

['][i]f you do not request a determination by [M]edical [A]ssistance or a payment is not made with the income and assets determined to be available for the [R]esident's care, the facility may ask the [c]ourt to order you to obtain the determination or to make payment.['] [14]

It is clear that also there was no evidence presented to this Court that there was at any point in time a request to process the Mariner Health Care bills through medical assistance via the Prince George's County [D]epartment of [S]ocial [S]ervices.

(Alterations added).

 The trial judge determined that both Patricia and Audrey were liable to Mariner Health for damages. This determination raises the issue of whether the contract is ambiguous, particularly the interpretation of specific language contained in a footnote, pertaining to the role and personal

---

**13.** This section is located in the "3.B. *Private Pay Residents* " section of the agreement. We hold that this section was not applicable to either Audrey or Patricia. Patricia indicated in the agreement that Audrey's care would be paid only by Medicare and/or Medical Assistance, thus Audrey was not a Private Pay Resident.

**14.** This language, also, is contained in the section titled "3.B. *Private Pay Residents* " section of the agreement. Patricia indicated on the agreement that Audrey's care would be paid only by Medicare and/or Medical Assistance, we find that this section was applicable to residents who paid with private funds, as such, this section was not applicable to Audrey.

Further, we disagree with Mariner Health's argument that this section of the agreement makes the agent, Patricia, personally liable to Mariner Health. We interpret the language of the sentence to mean that if Audrey was a private pay resident, Patricia would have to either request a determination from Medical Assistance or pay the nursing home costs with Audrey's personal funds. *See infra* at 18–19.

liability of a nursing home resident's agent. Generally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement. Under the objective theory of contracts we look at what a reasonable person in the same position would have understood as the meaning of the agreement. *Aetna Cas. & Sur. Co. v. Insurance Comm'r*, 293 Md. 409, 420, 445 A.2d 14, 19 (1982); *Board of Trustees of State Colleges v. Sherman*, 280 Md. 373, 380, 373 A.2d 626, 629 (1977); *Sagner v. Glenangus Farms*, 234 Md. 156, 162, 198 A.2d 277, 283 (1964). When interpreting a contract, our main focus is the "customary, ordinary, and accepted meaning" of the language used. *Atlantic Contracting and Material Co., Inc. v. Ulico Cas. Co.*, 380 Md. 285, 301, 844 A.2d 460, 469 (2004)(quoting *Lloyd E. Mitchell, Inc. v. Maryland Cas. Co.*, 324 Md. 44, 56–57, 595 A.2d 469, 475 (1991)). This Court adheres to a well-settled principle, when interpreting a contract, that

> [u]nder Maryland law, the interpretation of a contract, including the question of whether the language of a contract is ambiguous, is a question of law subject to *de novo* review. *See Towson v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004). We have long adhered to the objective theory of contract interpretation, giving effect to the clear terms of agreements regardless of what the parties may have intended by those terms at the time of contract formation. *Id.* at 78, 862 A.2d at 946–47. Under the objective theory:
>
>> "A court construing an agreement under [the objective theory] must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Dennis v. Fire & Police Employees Ret. Sys.*,

390 Md. 639, 656–57, 890 A.2d 737, 747 (2006) (quoting *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)(internal quotations omitted)).

*Myers v. Kayhoe,* 391 Md. 188, 197–99, 892 A.2d 520, 526–27 (2006).

We conclude that the trial court was erroneous in its ruling for several reasons. First, Patricia, as agent, can bind Audrey, the principal, to a contract, however, Patricia is not personally liable in damages for breach of that contract. Secondly, the trial judge's misinterpretation of the contract was based upon two provisions in the document under consideration that specifically did not apply to either Patricia or Audrey.

The trial judge based his judgment on two provisions contained in section "B" of the agreement, *supra* at n. 12–13, which applied exclusively to private pay residents. Audrey, however, was not a private pay resident because there was no evidence at trial that her private funds were used to pay for her care. Patricia expressly indicated on the agreement, *supra* at 6, that Audrey's care would be paid with either Medicare or Medical Assistance and not with Audrey's personal funds. Patricia cannot be held personally liable under the terms of the agreement, *supra* at 9, because she did not knowingly or voluntarily agree to use her personal funds to pay for her mother's nursing home care. The Medical Assistance section applicable to Audrey's care, *supra* at 7–8, contained language which stated that Mariner Health would assist the agent in applying for and obtaining Medical Assistance benefits.[15] Furthermore, if there were services or items not covered by Medical Assistance and Patricia, as agent, did not pay for those services, the facility was free to initiate transfer or discharge procedures against Audrey. *See* § 19–345(a)(4).

---

**15.** Before this Court, at oral argument, co-counsel for Patricia stated that a facility would need to aid an individual with requesting a determination and applying for Medical Assistance because the procedures are difficult to understand for a layman.

Secondly, one of the private pay provisions which is contained in a footnote provides: "If you do not request a determination by Medical Assistance, or if payment is not made with the income and assets determined to be available for the Resident's care, the Facility may ask the court to order you to obtain the determination or *to make payment.*" [16] (Emphasis added.) The trial judge misinterpreted that provision. The trial judge essentially based his decision on the last three words of the provision to establish Patricia's personal liability. We disagree with that conclusion.

The language of the private pay provision is clear and unambiguous. The trial judge, however, interpreted the language to mean that if Patricia did not request Medical Assistance to pay Audrey's bill, Patricia would be personally liable for payment. To the contrary, a correct interpretation of the language means that if an agent does not (a) request a determination by Medical Assistance or (b) make payment with the Resident's assets or income determined available for the Resident's care, then the facility may ask the court to order the agent to do either (a) or (b). The last three words, *"to make payment "* does not mean that an agent can be held liable for the principal's breach of contract.

The trial judge was incorrect in (1) basing his opinion on two provisions that do not apply to Patricia or Audrey because they were not private pay residents, and (2) misinterpreting the language to mean that Patricia was personally liable for her mother's nursing home care. As we note in the next section, *infra,* the trial judge's determination contradicts § 19–344(c) of the Health–General Article and Code of Maryland Regulations (COMAR) 10.07.09.07 that an agent's liability is limited regarding nursing home facilities and agreements that stem from that relationship.

---

16. The trial judge found the additional language in the Financial Agreement supported the conclusion that Patricia was personally liable. *See supra* pp. 6–7,15–16. The language was located, *supra* at note 12, in the Private Pay Residents section of the agreement.

## Statute

The agreement was based on § 19–344(c) and was discussed by both petitioner and respondent in their appellate briefs. The Legislative history demonstrates that the Department of Health and Mental Hygiene ("DHMH") and the Maryland State Bar Association reviewed independent nursing home contracts and found inconsistencies and "widespread use of clauses in violation of existing law or of questioned conformity." Department of Legislative Reference, Bill Summary, HB 683 at 2 (1988). As a result of legislation, all Maryland nursing homes are required to draft their admissions contracts to reflect the state's model. COMAR 10.07.09.06 § A–B (1996). Mariner Health contends that the agreement was fair, equitable, and that the language paralleled the State's statutory provisions.

Further, Mariner Health asserts that Patricia breached her duty to apply for Medical Assistance, therefore, Patricia is personally liable under the statute for damages incurred by the nursing home. Moreover, Mariner Health maintains that the absence of an express prohibition in § 19–344(c) permits a private cause of action against the resident's agent for breach of contract.[17] According to Mariner Health, because a private

---

17. Mariner Health cites *Allfirst Bank v. DHMH*, 140 Md.App. 334, 780 A.2d 440 (2001) which considers the issue of attorney fees which were not expressly provided for in Health–General § 19–337. The intermediate appellate court held that attorney fees are based on a contractual right that the, "statute does not say how payment to a secured creditor is to be made or when it is to be made." *Id.* at 367, 780 A.2d at 459.

Our case *sub judice*, is distinguishable from *Allfirst*, because the language of § 19–344 clearly provides for a statutory remedy, which Mariner Health chose not to follow. The boundaries of the statute are clear that if an agent fails to request a determination or seek Medical Assistance, a nursing home has two choices: (a) seek an injunction; or, (b) request that the Attorney General seek enforcement of the agent's statutory duties. In other words, the facility *may* petition a circuit court to compel the agent to either *request a determination for Medical Assistance or apply for Medical Assistance. Whether or not the facility seeks an order from the court, the Attorney General is responsible for pursuing civil enforcement remedies when an agent wilfully or with gross negligence violates the law. *See* § 19–344(c)(4)(v), (5)(iii), (6)(iii) of the Health–General Article.

cause of action was not expressly authorized does not defeat the contractual right to one. In Mariner Health's view, it was not required to pursue statutory remedies because the legislative enactments did not bar Mariner Health from seeking a private cause of action.

Patricia argues that the statute provides remedies that Mariner Health failed to pursue before it filed a private cause of action. Further, Patricia contends that Mariner Health failed to notify her promptly that Medicare had ceased paying for Audrey's care and failed to advise and assist her in applying for Medical Assistance as required by the statute.

The cardinal rule of statutory interpretation is to ascertain and effectuate legislative intent. *O'Connor v. Baltimore County,* 382 Md. 102, 113, 854 A.2d 1191, 1198 (2004); *Privette v. State,* 320 Md. 738, 744, 580 A.2d 188, 191 (1990) (citations omitted). We may consider the general purpose and aim of a statute in an effort to discern legislative intent. *Kaczorowski v. Mayor of Baltimore,* 309 Md. 505, 513, 525 A.2d 628, 632 (1987). Our long-standing rule is that if the language used in the statute is clear, unambiguous, and consistent with its objective, the words will be accorded their ordinary meaning. *Ayres v. Townsend,* 324 Md. 666, 672, 598 A.2d 470, 473 (1991) (citations omitted); *see G. Heileman Brewing Co., Inc. v. Stroh Brewery Co.,* 308 Md. 746, 755, 521 A.2d 1225, 1230 (1987).

Advancements in the area of nursing home care regulations by the government began with the Federal Nursing Home Bill of Rights which was derived from the Social Security Act designated as the Patient's Bill of Rights, as a stipulation for nursing homes participating in the Medicaid program. *See* 42 U.S.C. §§ 301–1397 (1982); David S. Douglas, et. al., ℞ for the Elderly: Legal Rights (And Wrongs) Within The Health Care System, 20 HARV. C.R.-C.L. L.REV. 425, 471–72 (1985). The federal Patient's Bill of Rights offered a compilation of patient rights, which contain provisions that require nursing homes to provide patients with information concerning their medical needs, conditions and costs. In the 1980's the Maryland

Legislature enacted similar legislation by establishing provisions set forth in Maryland Code (1982, 2000 Repl.Vol.), §§ 19–342–19–345 of the Health–General Article, sometimes referred to as Maryland Nursing Home Bill of Rights ("NHBR"). *See Oak Crest Village, Inc. v. Murphy,* 379 Md. 229, 240, 841 A.2d 816, 822–23 (2004); *Mitchell v. Baltimore Sun Co.,* 164 Md.App. 497, 512, 883 A.2d 1008, 1017 (2005). The NHBR provides a nursing home resident with similar rights and protections. Further, part of the NHBR mandates that nursing home admissions agreements shall be fair, clear, understandable, and conform to the law. *See* Bill Summary, H.B. 683 at 2.

In 1988, the General Assembly passed House Bill 683 which amended § 19–344 of the Health–General Article and prescribed in subsection 19–344(c) the rights and responsibilities of an "agent." The legislature intended to limit an agent's personal liability. That intent was evidenced by the bill summary, which states:

> [House] Bill [683] clarifies that the financial responsibility of an applicant's agent is limited to the extent of the applicant's funds but the facility may require the agent to distribute any funds of the applicant for the costs of care that are not covered by Medicare that the applicant agreed to pay.

Bill Summary, H.B. 683 at 1. Further, the legislative rationale for the amendment was that

> the circumstances surrounding admission to a nursing home are highly stressful for applicant[]s and their families. Most people are not in a position to carefully read and negotiate a contract at this time. It is therefore vital that the contracts be screened to assure that they conform to existing law and are clear and understandable.

*Supra* at 2.

Section 19–344(c) provides for the duties of agents (as attorneys-in-fact, guardians, representatives' payees, or mere family members or friends) who handle income and assets for

a nursing home resident or have some control over the person's income and/or assets. It states:

> *Duties and rights of applicant's agent.*—(1) In this subsection "agent" means a person who manages, uses, or controls the funds or assets that legally may be used to pay the applicant's or resident's share of costs or other charges for the facility's services.

Section 19–344(c)(1) of the Health–General Article. An agent's responsibility includes ensuring that payment is made with the funds or assets delegated to pay for the resident's nursing home care. An agent is responsible to, if necessary, request a determination or seek Medical Assistance on behalf of the resident.

The Code of Maryland Regulations explicitly and in detail outlines the liabilities, responsibilities, and rights of a nursing home admission's contract agent as:

**Third–Party Signature on Admission Contract.**

\* \* \* \*

B. If an agent ... signs the contract, the agent accepts responsibility to pay for the cost of the resident's care only to the extent of the resident's available funds and assets.
C. If an agent ... signs the contract, the agent is not, by signing the contract, accepting any responsibility for making payments from the agent's own personal funds, unless the agent does so voluntarily. The facility shall list separately in the contract any obligations voluntarily entered into by the agent, and the agent shall initial these obligations on the contract.
D. An agent who has not paid a current obligation for the resident's care may apply to the Medical Assistance Program for a determination of the funds available to pay for the cost of the resident's care.
E. An agent shall distribute any funds, including income or assets of the applicant or resident that the Medical Assistance Program has determined to be available, to pay for the cost of the resident's care in the facility.

F. An agent shall seek, on behalf of the applicant or resident, all assistance from the Medical Assistance Program that may be available to the applicant or resident. G. The Attorney General may impose civil money penalties against an agent who wilfully or with gross negligence violates the requirements of this regulation as follows:

(1) An agent who wilfully or with gross negligence violates § E of this regulation is subject to a civil money penalty not less than the amount of funds subject to the violation; and

(2) An agent who wilfully or with gross negligence violates § F of this regulation is subject to a civil money penalty not exceeding $10,000.

COMAR 10.07.09.07 (1996).

A nursing facility may "not require a third-party guarantee of payment to the facility as a condition of admission." 42 USCA 1395i–3(c)(5)(A)(ii) or 1396r(c)(5)(A)(ii). The Maryland statute, however, allows an individual to guarantee payment for a resident's care. Section 19–344(c)(7) of the Health–General Article ("[N]othing in this subsection may be construed to prohibit any person from knowingly and voluntarily agreeing to guarantee payment for the cost of an applicant's care"). Thus, an agent could agree to guarantee payment of the resident's costs. An agent of the nursing home resident may be subject to penalties if the agent willfully or with gross negligence either fails to seek or distribute medical assistance funds earmarked for the resident's care. *See* § 19–344(c)(4) and (5) of the Health–General Article.

 In summary, an agent's responsibility is limited to the administration and management of the resident's funds. An agent is not personally liable for the resident's nursing home care costs, unless the agent, voluntarily and knowingly agrees to pay for the resident's care with the agent's own funds.[18]

---

18. Patricia indicated in her agreement with Mariner Health that she did not "knowingly and voluntarily agree" to use her own resources to pay for her mother's nursing home care.

Section 19–344(c)(5)(i)–(iii) provides that an agent shall apply for medical assistance, that the nursing home facility must assist and advise the agent in seeking that assistance, and if the agent fails to seek assistance on behalf of the resident, the facility may petition a court to compel the agent to apply for assistance.[19] Further, an agent, "who willfully or with gross negligence violates the requirements of ... [§ 19–344(c)(5)] ... regarding an application for medical assistance by or on behalf of an applicant or resident is subject to a civil penalty not exceeding $10,000.00." Section 19–344(c)(6)(ii) of the Health–General Article.

### Statutory Remedies

■■■ There were several statutory remedies that Mariner Health chose not to pursue. Mariner Health argues that there are no statutory preconditions to a facility's right to sue an agent for breach of the Resident's Agent Financial Agreement because § 19–344(c) does not prohibit or condition a facility's contractual action against a resident's agent. Mariner Health contends that one of the remedies is that a facility "may ... petition the appropriate circuit court for an order...." The word "may" denotes, it argues, that the General Assembly considered this remedy to be permissive rather than mandatory. Section 19–344(c)(5)(iii). Mariner Health further asserts that the statute "merely notes" that the Attorney

---

19. Section 19–344(c)(5)(i),(ii) and (iii) states:

(i) An applicant, a resident, or the agent of an applicant or resident shall seek, on behalf of the applicant or resident, all assistance from the medical assistance program which may be available to the applicant or resident.

(ii) The facility shall cooperate with and assist the agent in seeking assistance from the medical assistance program on behalf of the applicant or resident.

(iii) If a resident or the agent of a resident fails to seek assistance from the medical assistance program or to cooperate fully in the eligibility determination process, a facility providing care to the resident may, without requesting the appointment of a guardian, petition the appropriate circuit court for an order requiring the resident or agent of the resident to seek assistance from the medical assistance program or to cooperate in the eligibility determination process with due diligence.

General is responsible for enforcing and prosecuting agents who fail to apply or request a determination for Medical Assistance.

Section 19–344(c) does not expressly state that a private cause of action against a resident's agent is authorized or prohibited under the statute. In the absence of that statutory directive, we think it is not appropriate to expand the statute to include remedies that were not specified. Further, "[a] frequently stated principle of statutory construction is that when legislation expressly provides a remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." *Sugarloaf Citizens Assoc., Inc. v. Gudis*, 78 Md.App. 550, 560, 554 A.2d 434, 439 (1989), *aff'd*, 319 Md. 558, 573 A.2d 1325 (1990) (quoting *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646, 652 (1974)).

In *Sugarloaf*, the statute provided for criminal penalties, administrative punishments, injunctive relief, and taxpayer suits under limited circumstances. It did not provide, however, for private causes of action. The Court of Special Appeals held:

> The remainder of the legislative history is silent in regard to implied private rights of action.
>
> *Where the legislative history does not indicate any discussion whatsoever as to whether a statute gives rise to such a right, the fact that the ordinance is silent would weigh heavily against an intent by the council to create a private cause of action.* "[T]he legislative history of the 1934 Act simply does not speak to the issue of private remedies.... At least in such a case as this, the inquiry ends there: The question whether Congress, either expressly or by implication, intended to create a private right of action, has been definitely answered in the negative."

*Id.* at 557, 554 A.2d at 437–38 (citations omitted) (emphasis added).

The intermediate appellate court held that the provisions of the Montgomery County Code at issue in that case did not

create an implied or express private cause of action. That court examined the legislative intent and relied upon the principle that "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Sugarloaf,* 78 Md.App. at 559, 554 A.2d at 438 (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146, 154–55 (1979)). We affirmed the judgment of the Court of Special Appeals on other grounds, but did not address whether the provisions of the Montgomery County Code created an implied or express private cause of action. *Sugarloaf Citizens Assoc. v. Gudis,* 319 Md. 558, 566–67, 573 A.2d 1325, 1330 (1990).

Further, the Amicus Curiae filed on behalf of the Maryland Chapter of the National Academy of Elder Law Attorneys in support of the Waltons' position provided:

> Applying these principles to another statute within Health General, Title 19, the Federal District Court for the District of Maryland held that Health General Section 19–712(b)(1)(ii) creates no private cause of action. *See IVTX, Inc.* [ . . . ] *v. United Healthcare of the Mid–Atlantic, Inc.,* 112 F.Supp.2d. 445 ( [D.Md.] 2000). There, the [p]laintiff; a provider of health care services, sued the [d]efendant health maintenance organization (HMO) for failure to pay the obligations (to the [p]laintiff) of a health care provider within the [d]efendant['s] HMO network. [*Id.*] The basis of the lawsuit, ['][for money owed,['] was Health General § 19–712(b)(1)(ii), which provides, *inter alia,* that an HMO who enters into [a] contract with a health care provider for health care services to the HMO members is responsible for all claims for services rendered by the health care provider. *Id.* at 446[–47].

> Relying upon Maryland law, the Court dismissed the complaint, holding that, because the statute contains a provision charging the Insurance Commissioner with enforcement of its terms, the inclusion of this express remedy to ensure payment to providers of health care services to

HMO's precludes any private cause of action for collection. *Id.* at 449, 573 A.2d 1325.

In an analogous case, but brought by a nursing home resident, the Fifth Circuit Court of Appeals has held that the federal Medicaid Act does not create an implied cause of action between Medicaid residents and their private nursing homes. *Stewart v. Bernstein,* 769 F.2d 1088 (5th Cir.1985). There, a nursing home resident claimed that the Medicaid Act afforded her an implied private cause of action against a nursing home from which she had been involuntarily discharged in violation of federal Medicaid regulations. Noting that the Medicaid Act provides specific remedies for the enforcement of regulatory rights, the Court refused to provide a private remedy, stating that absent any [']direct evidence['] to the contrary, the judiciary [']will not engraft a remedy on a statute, no matter how salutary, that congress did not intend to provide.['] *Id.* at 1092 (quoting *California v. Sierra Club,* 451 U.S. 287, 297[, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101] (1981)).

[Alterations added.]

In 1995, the General Assembly passed House Bill 343 to safeguard nursing home residents from being involuntarily discharged from a facility due to nonpayment. *See* House Bill 343, Bill Summary, Department of Legislative Reference (1995). The thrust of the Bill and the intent of the Legislature was to ensure protection for nursing home residents and their agents from unscrupulous and unethical actions by a nursing home facility. The purpose of the legislation was to place limitations on nursing home facilities and to limit their remedies against residents and their agents pursuant to statute. Thus, the Legislature set forth expressly those remedies a nursing home facility could pursue when dealing with a nonpaying resident.

If an agent fails to apply for assistance through the medical assistance program on behalf of the resident, the agent is in violation of the requirements of § 19–344(c)(5) and, "is subject to a civil penalty not exceeding $10,000.00." Section 19–

344(c)(6)(ii).[20] If an agent violates his or her duties under § 19–344(c)(4) or (5), the agent is also subject to civil penalties.[21] A nursing home facility may obtain a court order compelling an agent to fulfill his or her duty to disburse funds and/or apply for medical assistance.[22] If a facility elects not to pursue the remedies provided under § 19–344(c)(4) or (5), to petition a circuit court for an order to compel an agent to either apply or request a determination for Medical Assistance, it may not then, as Mariner Health suggests, seek a private cause of action. The statute does not provide for such a remedy.

A nursing home facility *may* choose to obtain a court order to compel an agent to either apply or request a determination for Medical Assistance. It *must,* however, report any violation of § 19–344(c)(4) and (5) to the Attorney General because, "[t]he Attorney General is responsible for the enforcement and prosecution of violations of paragraphs (4) and (5) of this subsection." *See* § 19–344(c)(6)(iii).

The trial judge did not address the issue of statutory remedies or Mariner Health's failure to pursue those remedies. Mariner Health was bound under the statute to pursue any applicable statutory remedies. We hold that a trial court may not, carte blanche, ignore the statutory provisions imposed to limit a nursing home facility's cause of action against family members acting as agents for a sick or elderly family

---

**20.** A nursing home facility should report any violation of § 19–344(c)(4) and (5) to the Attorney General, "[t]he Attorney General is responsible for the enforcement and prosecution of violations of paragraphs (4) and (5) of this subsection." See § 19–344(c)(6)(iii).

**21.** If an agent violates the requirements of § 19–344(c)(4) and obtains funds for the resident's care, yet was willfully and grossly negligent in distributing those funds when due to the facility, the agent shall be liable to "a civil penalty not less than the amount of funds subject to the violation." Section 19–344(c)(6)(i).

**22.** The provisions of COMAR (similar to the language contained in § 19–344(c)(6)(i)) provides that an agent is subject to a civil penalty imposed by the Attorney General, not exceeding $10,000.00, if the agent wilfully or with gross negligence fails to apply for Medical Assistance. *See supra* at note 6.

member. Both § 19–344(c) and COMAR prescribe the rights and responsibilities of an agent to essentially the administration and management of a resident's funds.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IS REVERSED. THE CASE IS REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT AGAINST PATRICIA WALTON. COSTS TO BE PAID BY RESPONDENT.**