The Honorable Galen Clagett Maryland House of Delegates
Have asked for our opinion on the proper use of revenues appropriated to the Department of State Police ("Department") from the Maryland Emergency Medical System Operations Fund ("Fund") for helicopter medevac services. Following a recent audit of the Department, the Legislative Auditor recommended that an opinion be obtained whether the Department's method of allocating costs of its Aviation Command to the Fund is consistent with the purpose of the Fund.
For the reasons explained below, we conclude that the Department's allocation of costs relating to its helicopter operations to the Fund based on the past proportionate use of the helicopters for emergency medical transports is a reasonable implementation of the statutory restrictions on the use of the Fund. The Department should periodically review the allocation ratio in light of actual experience.
 I Background
A. Medevac Program
The Aviation Command consists of approximately 150 employees, including pilots, paramedics, and other personnel necessary for the Command's operation. The Command includes a fleet of 12 Dauphin helicopters and three fixed wing aircraft stationed at eight locations around the State to facilitate response time. Seehttp://www.mspaviation.org. *Page 4 
The helicopters are used primarily for medical evacuation — "medevac" — services that involve the transportation of individuals who have experienced serious injuries to an appropriate shock trauma facility.[1] It is widely recognized that the Command's medevac program contributes significantly to the State's emergency medical response system. In recent years, the Aviation Command has undertaken more than 6500 emergency medical service activities each year — estimated to be between 72% and 79% of the total operational activities of the Command. Department of Budget Management, Maryland OperatingBudget, FY 2008, III-732 (2007). Other activities of the Aviation Command include search and rescue, law enforcement activities, and homeland security missions.[2] Id.
B. The Fund
The General Assembly established the Fund in 1992 as a special fund to finance certain emergency medical services. Chapter 269, §§ 28, 30, Laws of Maryland 1992, codified at Annotated Code of Maryland, Transportation Article ("TR"), § 13-955. The major source of revenue for the Fund is an annual surcharge paid in connection with the registration of motor vehicles. TR §§ 13-954 and 13-955(c); see Maryland Operating Budget, FY2008, I-303.[3]
Money in the Fund is dedicated by statute to specified emergency service purposes, including "[m]edically oriented functions" of the Department's Aviation Command. The statute reads, in pertinent part:
 The money in the Fund shall be used solely for: *Page 5 
 (1) Medically oriented functions of the Department of State Police, Special Operations Bureau, Aviation Division;
 (2) T he Maryland Institute for Emergency Medical Services Systems;
 (3) The R Adams Cowley Shock Trauma Center at the University of Maryland Medical System;
 (4) The Maryland Fire and Rescue Institute;
 (5) The provision of grants under the Senator William H. Amoss Fire, Rescue, and Ambulance Fund in accordance with the provisions of Title 8, Subtitle 1 of the Public Safety Article; and
 (6) The Volunteer Company Assistance Fund in accordance with the provisions of Title 8, Subtitle 2 of the Public Safety Article.
TR § 13-955(e). The State Emergency Medical Services Board ("EMS Board") is charged with reviewing and approving annually the portion of the proposed budget of the Aviation Command that is provided through the Fund. See Annotated Code of Maryland, Education Article, § 13-508(b)(2)(ii)4 and (c). For the current fiscal year, $17,825,895 was appropriated to the Aviation Command from the Fund. Chapter 487, W00A01.02, Laws of Maryland 2007; see Maryland Operating Budget, FY2008, III-749.[4] The remaining operating costs of the Command are funded by an appropriation from the general fund.
It is our understanding that the Department has always determined the portion of the costs of its helicopter operations supported by th e Fund, i.e., "medically oriented functions," based on *Page 6 
the proportion of its operational activities involving emergency medical services. See, e.g., Maryland State Police Aviation Command, F actSheet, re Distribution of EM SO F Funding (February 19, 2007). Prior to Fiscal Year 2003, 70% of the costs of helicopter operations were covered by the appropriation from the Fund. According to the Department, it began allocating 80% of the costs to the Fund in Fiscal Year 2003 in response to instructions from the Department of Budget and Management ("DBM"). Id.
C. Legislative Audit
During its most recent audit of the Department, the Legislative Auditor found that the Department "had not determined if the method used to allocate costs to the . . . Fund was consistent with statutory restrictions governing use of the Fund." Office of Legislative Audits,Audit Report: Department of State Police, p. 19 (February 2007) (Finding 6). The Auditor noted that, although the law allows the Fund to be used for the Aviation Command's medically oriented functions, the Department "routinely charged 80 percent of the total Command cost . . . to the Fund based on calculations for previous years that indicated that 80 percent of the [Department's] helicopter activity was for medical transports. However, [the Department] included costs that were not medically oriented in the calculation." Id.[5] The Auditor recommended that the Department "determine the intent of the State law regarding the use of the Fund (such as by obtaining an opinion of the Attorney General) and, after determining the proper use of the Fund, ensure that the methodology used to allocate costs to the Fund is in accordance with the legal intent. In addition, we recommend that [the Department] determine the necessity of reviewing expenditures previously charged to the Fund and processing correcting entries to remove any improperly applied expenditures." Id., pp. 19 — 20.[6]
In its response to the audit, the Department noted that the "[c]urrent statute is silent as far as the methodologies for the application of [the] Fund. . . . [In the past, the] appropriation of funds *Page 7 
by the [Department] has been approved by DBM, overseen and approved by the EMS Board, and subsequently approved by the Legislature through the approval of [the Department's] budgets and budget language."Id., Appendix. The methodology under which the Department charges "80% of all helicopter flights to [the Fund] was based on data presented to legislative committees. . . ." Id. The Department "contends that hanger costs, heating, air conditioning, light, etc., is needed to support the helicopters and medevac program and as such, is and always has been an allowable expense." Id.[7]
 II Analysis
Your request concerns the appropriateness of the general methodology employed by the Department in allocating a fixed percentage of operational costs of its helicopters to the appropriation from the Fund. The Legislative Auditor questioned whether that methodology is consistent with the Legislature's intent in establishing the Fund. This raises a question of statutory construction, which involves an effort to "ascertain and effectuate legislative intent." Walton v. Mariner Healthof Maryland, Inc., 391 Md. 643, 664, 894 A.2d 584 (2006).
A. Statutory Language
The starting point is the statutory language itself. Rose v. Fox PoolCorp., 335 Md. 351, 359, 643 A.2d 906 (1994). As noted earlier, the relevant statute provides that money in the Fund is to be used "solely for" certain specified purposes, including "medically oriented functions" of the Aviation Command. TR § 13-955(e)(1). The statute does not define "medically oriented functions," nor does it provide specific direction to the agency on how to allocate costs of equipment or personnel that may be devoted both to those functions and to other duties of the Aviation Command. *Page 8 
The statutory language is open to alternative interpretations. On the one hand, it could mean that the Fund may be used only for the direct costs of such services — i.e., the compensation of helicopter pilots and paramedics that relates to the time actually spent responding to medical emergencies, actual fuel costs, and other direct costs involved in assisting individuals requiring medevac services. On the other hand, the language could be interpreted more broadly, as the Department has done, to allow money from the Fund to cover a share of the overall operating costs of the Aviation Command's helicopter operations, based on the proportion of its activities devoted to medevac services.
When statutory language is open to multiple interpretations, as is the case here, it is helpful to review the legislative history of the enactment and any relevant agency interpretation for insight into legislative intent. See, e.g., Thomas v. Dep't of Labor, Licensing Regulation, 170 Md. App. 650, 659, 908 A.2d 99 (2006).
B. Legislative History
TR §§ 13-954 and 13-955 were initially enacted during the 1992 regular legislative session as part of the Budget Reconciliation Act for Fiscal Year 1993, but the provisions were contingent on the failure to enact separate legislation for 1993 fiscal year. Chapter 269, §§ 28 and 30, Laws of Maryland 1992 (Regular Session). The General Assembly subsequently enacted these provisions as part of separate legislation, and the registration surcharge supporting the Fund took effect July 1, 1992. Chapter 3, §§ 1 and 19, Laws of Maryland 1992 (First Special Session).
The use of a vehicle registration surcharge to fund the Department's medevac program originated as a recommendation of the Governor's Commission on Efficiency and Economy in State Government.[8]
Preliminary Report at p. 16 (December 1991). However, in making that recommendation, the Commission Report did not discuss the details of determining such costs. Id.[9] *Page 9 
While the Legislature has subsequently amended TR §§ 13-954 and 13-955
on several occasions, including an increase in the annual surcharge, the language key to your inquiry concerning the Department's helicopter operations — fund revenues "shall be used solely for . . . [m]edically oriented functions" — has remained unaltered. TR § 13-955(e)(1).
Thus, the legislative history of the statute does not suggest that the Legislature intended that the Department use a specific methodology for determining costs eligible for support from the Fund. In any event, it does not preclude the interpretation that the Department has adopted. Accordingly, we consider other principles of statutory construction.
C. Deference to Agency Interpretation
When a statute is open to alternative interpretations, the interpretation of the agency charged with administering the statute generally is entitled to considerable deference. See, e.g., Bednar v.Provident Bank of Maryland, ___ Md. ___, ___, ___ A.2d ___ (2007) [2007 WL 4335536 * 8]; see also 3 N. Singer, Statutes and StatutoryConstruction § 65:5 (6th ed. Rev. 2001) (administrative interpretation and practice accorded great weight as an extrinsic aid in statutory interpretation). Such deference is particularly appropriate when the agency's interpretation is a long-standing one, developed shortly after the statute's enactment. Adamson v. Corr. Med. Serv.,Inc., 359 Md. 238, 266, 753 A.2d 501 (2000) (such interpretation should not be disregarded "except for the strongest and most urgent reasons").
It appears that, from the inception of the Fund, the Department has implemented the statute by allocating a portion of its helicopter costs to the Fund based on the proportion of its helicopter activities devoted to medevac services. The EMS Board, the agency charged *Page 10 
with overseeing proposed uses of the Fund, has reviewed and approved budget proposals using that methodology. In our view, the Department's consistent interpretation of TR § 13-955(e)(1), and the manner in which it has allocated costs related to its helicopter operations to the Fund, are entitled to a presumption of validity.
D. Legislative Acquiescence in Agency Interpretation
A factor considered in evaluating the deference owed to an agency's interpretation is the Legislature's awareness of and acquiescence in the agency's interpretation. See, e.g., Morris v. Prince George'sCounty, 319 Md. 597, 613, 573 A.2d 1346 (1990).
In this case, the Department's methodology has been detailed for the General Assembly each year as part of the State budget process. Beginning with the budget for Fiscal Year 1995, the General Assembly has required DBM to include in the budget books for informational purposes a description of proposed expenditures from the Fund, including funding for the Aviation Command. Annotated Code of Maryland, State Finance and Procurement Article, § 7-121(b)(4). As early as 1993, the Legislature's fiscal analysts documented the Department's method for allocating the Aviation Command's costs between the Fund and the general fund.See Department of Fiscal Services, Report on Emergency Medical Services Issues, p. 8 (January 1993). More recently, a Joint Legislative Committee established to study the structure and funding of the State's emergency medical response system[10] was briefed on the manner that the Department allocates costs to the Fund. That information was factored into the Department of Legislative Services' forecast and reflected in the Committee's report. Joint Legislative Committee to Study and Make Recommendations About the Structure and Funding of the State's Emergency Medical Response System, Final Report, Appendix 1, p. 16 (January 2005) (Reprint of 2003 Interim Report). Finally, since at least 2001, the Legislature's staff analysis of the Governor's proposed budget has noted the split between special fund and general fund revenue used in supporting the Department's helicopter operations. See,e.g., Department of Legislative Services, Maryland Emergency MedicalSystem Operations Fund, Fiscal 2002 Budget Overview, p. 2, availableat http://mlis.state.md.us/2001rs/budget_docs/All/Operating/MEMSOF_-_Maryland_Emergency_Medical_System_ *Page 11 
Operating_Fund.pdf. Most recently, the legislative staff analysis has expressed the concern that the Department has not adjusted the percentages used in its methodology in light of its most recent experience. See Department of Legislative Services, Analysis of the FY2008 Maryland Executive Budget, 2007: Maryland Emergency Medical SystemOperations Fund, Fiscal 2008 Budget Overview at pp. 14, 17.
The extent of the Department's use of the Fund to support helicopter operations and its allocation methodology have been reported to the General Assembly on a regular basis. In light of the Legislature's awareness of the Department's allocation methodology, the absence of any action by the Legislature supports the conclusion that the method of allocating costs to the Fund is consistent with legislative intent.
 III Conclusion
In our opinion, the Department's allocation of a portion of the costs of its helicopter operations to the Fund based on the past proportionate use of the helicopters for emergency medical transports in a reasonable interpretation of the statute governing the Fund. The Department should periodically review the allocation ratio in light of actual experience.
Douglas F. GanslerAttorney General
William R. VargaAssistant Attorney General
Robert N. McDonaldChief CounselOpinions and Advice
[1] There is no specific statutory authority for the Department to provide medevac services. Rather, the Department's authority is premised on its "general duty to safeguard the lives and safety of all persons in the State . . .". Annotated Code of Maryland, Public Safety Article, § 2-301(a)(1). See 76 Opinions of the Attorney General 95, 99-100 (1991). The State does not charge patients requiring emergency medevac transport.
[2] The fixed wing aircraft are used for extradition of prisoners from other states and other law enforcement purposes (speed enforcement, surveillance, and crime scene photography).
[3] The surcharge of $13.50 is divided between the Fund ($11) and the Maryland Trauma Physician Services Fund ($2.50). TR § 13-954(b).
[4] This amount represented approximately one-third of the total appropriations from the Fund. See Department of Legislative Services,Analysis of the FY 2008 Maryland Executive Budget, Maryland EmergencyMedical Systems Operations Fund Fiscal 2008 Budget Overview, Exhibit 1.
[5] The Auditor cited as examples the inclusion of the cost of fixed wing aircraft not used for medical transports and payroll costs for two employees who had no Aviation Command or medically oriented duties.
[6] Although the audit included other findings pertaining to the Aviation Command, we have limited our review to Finding 6, the subject of your inquiry.
[7] The Department's response also noted that the costs of fixed-wing operations have been separated and 100% of fixed-wing operations are charged to general funds. As to employees improperly compensated through special funds, the response noted that the Department has reimbursed the Fund for the portion of time classified as "non-aviation related." See footnote 5 above.
[8] This Commission, known as the Butta Commission, had been created by executive order. COMAR 01.01.1991.29, 18:20 Md. Reg. 2192 (October 4, 1991).
[9] Separate legislation was introduced during the 1992 Session on behalf of the Butta Commission that would have established a surcharge "solely for" the State Police Airborne Law Enforcement and Emergency Services Program" and certain other emergency management purposes. House Bill 871 (1992 Regular Session). The Administration offered an amendment to that bill that would have limited use of surcharge revenues to the "direct operating costs" of the State Police Aviation Division. However, that bill and related proposed legislation was rejected by the respective legislative committees and the limiting language was not included in the legislation enacted.
[10] See Chapter 385, Laws of Maryland 2003. *Page 12